Kenneth BROWN

v.

**William H. (Bill) COSBY, Jr., et al.**

**Civ. A. No. 76–3367.**

United States District Court,
E. D. Pennsylvania.

July 13, 1977.

Ragan A. Henry, Philadelphia, Pa., for plaintiff.

Robert M. Landis, Philadelphia, Pa., for all defendants.

William F. Sweeney, Philadelphia, Pa., for defendant Western Pub. Co., Inc.

## OPINION

LUONGO, District Judge.

Plaintiff, Kenneth Brown, filed this suit on September 24, 1976 in the Court of Common Pleas of Philadelphia County, Pennsylvania. The suit was removed to this Court under 28 U.S.C. § 1441 on October 28, 1976. Brown has named as defendants: William H. (Bill) Cosby, Jr., the well known entertainer; Jemmin, Inc. (Jemmin), a California corporation owned primarily by Cosby; Filmation Associates (Filmation), a Nevada corporation; Lou Schimer and Norm Prescott, the two principals in Filmation; Windmill Books (Windmill), a corporation engaged in publishing; E. P. Dutton, Inc. (Dutton); Western Publishing Company (Western); Milton Bradley Company (Milton Bradley); Auto Aid Manufacturing Corporation (Auto Aid); Columbia Broadcasting System, Inc. (CBS); and McGraw-Hill, Inc. (McGraw-Hill).[1]

Brown alleges that defendants Cosby, Jemmin, Schimer, Prescott, and Filmation have, *inter alia*, breached written and oral contracts in which they agreed (1) to pay him a "fair share" of the profits derived from the commercial exploitation of cartoon characters he created; (2) to utilize his services exclusively in the preparation of artwork necessary for the commercial presentation of the characters; and (3) to have Brown retained as a consultant by firms developing or selling in any form the characters created by him. These defendants and the remaining defendants, Brown further alleges, have been unjustly enriched through their various efforts at commercial exploitation of the characters created by him, have infringed Brown's common law copyrights, and have unlawfully appropriated property of his. Brown also asserts causes of action for breach of a fiduciary relationship, fraud, and conspiracy. He seeks injunctive relief as well as damages. This Court's jurisdiction is based on diversity of citizenship between plaintiff and each defendant and an amount in controversy in excess of $10,000, 28 U.S.C. § 1332.

Various motions have been filed by the defendants. A motion to dismiss under Fed.R.Civ.P. 12(b)(6) has been submitted by all defendants except Schimer, Prescott and Western. The grounds for the motion are that plaintiff's claims are barred by the applicable statute of limitations, that plaintiff has failed to state a claim for breach of fiduciary relationship, fraud, or conspiracy, and that plaintiff has no common law copyright in the characters he created. Defendants Schimer and Prescott filed a motion to dismiss on grounds: (1) that this court lacks personal jurisdiction over them (Rule 12(b)(2)); (2) that there was insufficient service of process (Rule 12(b)(4)); and (3) that the complaint fails to state a claim upon which relief can be granted (Rule 12(b)(6)). The third ground incorporates by reference the arguments presented in the motion to dismiss of the other defendants. Defendant Western has filed a motion for summary judgment on grounds that "plaintiff's complaint fails to state a claim upon which relief may be granted in that the Statute of Limitations upon the claims for which plaintiff seeks relief has expired, the plaintiff had no contract right which has been breached, and, if it is assumed for purposes of argument that the plaintiff had any common law copyright on the aforementioned articles, said copyright ceased to exist when the characterization of the licensed articles was published . . . ." Western's motion for summary judgment "incorporates by reference" the motions to dismiss of the other defendants.

Plaintiff has filed two responses to defendants' motions. He has filed a "Re-

---

1. Plaintiff also named as a defendant Publisher's Hall Syndicate Division of Field Enterpris- es, Inc., but voluntarily discontinued the action against it on January 7, 1977.

sponse of Plaintiff to Motion of Defendants to Dismiss Pursuant to Rule 12(b)(6) . . .," apparently intended both as a response to the motion to dismiss under 12(b)(6) by the majority of defendants and as a response to Western's motion for summary judgment. Plaintiff's second responsive memorandum is to Schimer and Prescott's motion to dismiss in so far as they rely on Rules 12(b)(2) and 12(b)(4).

Each of the defendants' motions was accompanied by affidavits of one or more of the defendants. Plaintiff's responsive memoranda included no affidavits of plaintiff, but each memorandum asserts facts not contained in the pleadings and is accompanied by an affidavit of plaintiff's attorney stating that "the foregoing Response of Plaintiff . . . is true and correct to the best of my knowledge, information, and belief."

The attorneys for plaintiff and for defendant Western appear bent on mixing Rules 12(b) and 56, and the procedural requirements of each to suit their fancy. By treating the motions to dismiss as motions for summary judgment, however, as I am permitted to do under Rule 12(b), and by treating the facts alleged in plaintiff's memoranda as if they had been properly set forth by affidavit of plaintiff, a disposition of the motions can be reached which will substantially forward this suit.

Viewing the facts, then, as on defendants' motion for summary judgment, that is, resolving all material disputed facts and inferences therefrom in plaintiff's favor, including the facts presented in plaintiff's responsive memoranda, the facts may be stated as follows:

Plaintiff and Cosby were childhood friends who grew up and attended school together. In September 1970 Cosby contacted plaintiff in Philadelphia, and asked him to create cartoon characters representing mutual childhood friends whom Cosby had adapted into his comedy routine. With some of the ideas coming from Cosby, plaintiff developed various characters who are known by such names as "Fat Albert," "Old Weird Harold," "Mush Mouth," "Crying Charlie," and "Dumb Donald" (hereinafter the Characters). Plaintiff developed the Characters on paper over the next several months and into January 1971, receiving $250 per week from Jemmin to support himself. Plaintiff's understanding with Cosby and Jemmin was that initially he would keep his costs and salary very low for developing the Characters, but that he would receive substantial benefits from the development of the Characters at a later date. Plaintiff further understood that the initial use of the Characters would be for a series and/or a comic strip.

In December 1970 plaintiff, at the request of Cosby and Jemmin, delivered samples of the Characters to Schimer, Prescott and Filmation, who promised to hire plaintiff as a consultant for the development of a television show for children using the Characters. Certain changes were made in the Characters for their use on television, and the final Characters were delivered to Cosby, Jemmin, Schimer, Prescott and Filmation. After receiving the Characters, these defendants refused to communicate with plaintiff, but on January 19, 1971 Cosby and Jemmin requested plaintiff to, and he did, sign a letter agreement. The agreement provided that plaintiff was to be employed as an independent contractor to produce a series of comic strips to be published by Jemmin. Plaintiff was to receive a flat salary plus a percentage of receipts above certain amounts derived from syndication of the series. In the event that the series were published in comic book form, Jemmin agreed to negotiate with plaintiff in good faith as to additional compensation. The agreement further provided that Jemmin was to "exclusively own, in addition to your services, all of the results and proceeds thereof as though you were our employee-for-hire, including but not limited to all rights throughout the world of copyright, trademark, patent, production, manufacture, recordation, reproduction, transcrip-

tion, performance and exhibition by any medium now known or hereafter discovered and to obtain renewals thereof." Finally, the agreement provided that Jemmin "shall have the right to terminate this Agreement and all of our obligations and liabilities hereunder." The agreement was also signed by Publisher's Hall Syndicate, which agreed to be bound by it as it reflected the syndication agreement entered into between Publisher's Hall and Cosby.

Proximate to the time the agreement was entered into between the parties, Cosby, Schimer and Prescott promised plaintiff, and he understood, that he would participate in any other forms of commercial exploitation of the Characters, to wit, that he would receive no less than 25% of the profits generated by the Characters as his "fair share," that all artwork required to commercially exploit the Characters in whatever medium would flow through plaintiff's studio, and that he would be retained as a consultant by the various entities, including Filmation and CBS, who might also be involved in the commercial exploitation of the Characters.

At the time the agreement was signed, plaintiff had just completed art school and considered Cosby and Schimer personal friends, and believed that he could rely on their, as well as the other defendants' advice and promises. Plaintiff lacked any sophistication as to either the business or legal arrangements relating to his work.

Pursuant to the letter agreement, plaintiff developed the Characters into comic strip form, delivered the first set of drawings and received the initial $5,000 due under the agreement. In April 1971 plaintiff informed Cosby that he could not continue to meet deadlines and pay helpers and expenses on the money he was receiving. Cosby thereupon paid plaintiff $1,500. By the end of April 1971, the comic strip finals of the Characters were delivered to Jemmin, Cosby, Schimer and Publisher's. Cosby and Jemmin continued to urge plaintiff to keep working and to keep his development costs for the Characters low. They repeatedly stated that plaintiff would get his "fair share."

On June 27, 1971, Jemmin, through its attorney, forwarded a letter agreement to plaintiff for his signature. The proposed agreement would terminate the previous letter agreement of January 19, 1971. It provided that plaintiff was to receive the sum of $1,600, that no other compensation was due him under the previous agreement, and that Jemmin was the owner of all "results and proceeds" of plaintiff's services rendered under the previous agreement. This proposed agreement was premised on the termination of the syndication agreement between Jemmin and Publisher's Hall, and provided that if Jemmin later decided to activate the comic strip developed by plaintiff, Jemmin and plaintiff "will enter into good faith negotiations with respect to your rendering services as an artist with respect to such comic strip."

Plaintiff refused to sign the proposed letter agreement. All of the defendants thereafter refused to communicate with him. They have not sought his services, and he has received no further compensation from them since that time.

After the breakdown in relations between plaintiff and defendants, Cosby, Jemmin, Schimer, Prescott, Filmation, and Publisher's participated in the production of a television show entitled "Fat Albert" using characters which are identical or similar to the Characters created by plaintiff. This show has been televised on CBS affiliate stations for many months as one of its chief children's programs. Plaintiff's Characters have also been commercially exploited by defendants for films, books and a variety of novelty products. The commercial exploitation of the Characters has resulted in very substantial profits for the defendants.

The instant suit presents a choice of law question. Related to that issue, the following facts are undisputed: Plaintiff is presently a resident of Pennsylvania. Jemmin

is a California corporation. Since 1971 Cosby had been a resident of California and Massachusetts. Schimer and Prescott at all relevant times maintained business offices in California. Filmation is located in California. All of defendant Cosby's contacts with plaintiff concerning plaintiff's work for Jemmin took place in California. All of Schimer's and Prescott's contacts with plaintiff took place in California. The drawings were prepared by plaintiff in California, although he spent time in Philadelphia researching the Characters. The January 19, 1971 letter agreement was entered into in California. The June 27, 1971 termination agreement was mailed to plaintiff at a California address. The subsequent commercial exploitation of the Characters has occurred throughout the United States through corporations located in Wisconsin, New York, California, Massachusetts and other states.

### Discussion

#### I. Statute of Limitations—Law Applicable

■ The motion to dismiss on grounds that plaintiff's claims are time barred argues that California statutes of limitations are applicable. Plaintiff disputes this contention, but examination of the undisputed facts and relevant law makes clear that California limitations periods are, indeed, applicable. Since the matter is here on the basis of diversity jurisdiction, I am bound to apply Pennsylvania choice of law rules to determine which state's statute of limitations must be applied. *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Co.*, 372 F.2d 18, 20 (3d Cir. 1966), *cert. denied*, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967). Under Pennsylvania law, normally the statute of limitations of the forum state is applied. *Mack Trucks, Inc., supra* at 20. Pennsylvania has the following statutory exception, however:

"When a cause of action has been fully barred by the laws of the state or country

in which it arose, such bar shall be a complete defense to an action thereon brought in any of the courts of this commonwealth."

12 P.S. § 39.

Defendants argue that plaintiff's causes of action arose in California, and that they are, therefore, governed by California limitations periods. I agree.

■ Plaintiff's primary claim is for breach of contract. *Where* the cause of action for breach accrued is *in pari materia* with *when* the cause accrued. That is, "the cause arises where as well as when the final significant event that is essential to a suable claim occurs." *Mack Trucks, Inc., supra* at 20. A cause of action for breach of contract occurs at the time of the breach. *Donahue v. United Artists Corp.*, 2 Cal. App.3d 794, 83 Cal.Rptr. 131, 133 (1969); *In re Dixon Estate*, 426 Pa. 561, 233 A.2d 242 (1967). Defendants breached their contract with plaintiff either at the time they sent the proposed letter termination agreement to him on June 27, 1971, or when they stopped making payments to him under the written and oral agreements and failed to hire him as a consultant. During these times defendants Cosby, Filmation, Schimer and Prescott were located in California. The proposed letter agreement was sent to plaintiff in California. Plaintiff was working in California until some time after the proposed termination agreement was mailed to him. Clearly the breach occurred in California and, therefore, the California limitations period is applicable to plaintiff's contract claims.

#### II. Running of Limitations Period—Oral and Written Contract Claims

■ Turning to plaintiff's claim for breach of contract, the Complaint alleges both breach of the January 1971 letter agreement and breach of the oral contract modifying and supplementing the written agreement. Defendants assert that since

the breach of the written agreement occurred at the time or soon after the proposed termination agreement of June 27, 1971 was forwarded to plaintiff, any claim for breach of the written agreement is barred by California's four-year statute of limitations, California Code of Civil Procedure § 337(1). They further argue that the oral modification of the contract was a promise to hire plaintiff as a consultant for the development of a television show utilizing the Characters, that this agreement was also breached on or about June 27, 1971 when defendants failed to hire plaintiff as a consultant, and, therefore, plaintiff's claim for breach of the oral agreement is barred by California's two-year statute of limitations governing a cause of action for breach of an oral contract, California Code of Civil Procedure § 339(1).

Plaintiff does not dispute that the written agreement standing alone would be barred by the four-year limitations statute. He contends, rather, that the letter agreement "was orally modified by defendant, Cosby, and others to indicate that plaintiff was to get his 'fair share' not only of the profits to be generated from the comic strip, but also of all other forms of commercial exploitation of the characters . . . The contract at issue is a continuing one. It is analogous to an installment contract. The rule in California is that the statute of limitations does not bar recovery for installments which were due within the statutory period prior to institution of the action." Plaintiff's Memorandum (Document # 17) at 4–5. Plaintiff relies on *Bank of America National Trust & Savings Association v. McLaughlin*, 152 Cal.App.2d Supp. 911, 313 P.2d 220 (Super.Ct.1957), and *Lee v. DeForest*, 22 Cal.App.2d 351, 71 P.2d 285 (1937). These cases, although holding that a claim for payments due under a contract is not barred by the statute of limitations as to payments due within the limitations period, are readily distinguishable from the instant case and cannot control it.

*Lee v. DeForest, supra*, was a suit to recover payments due under an apartment lease. The defendant-lessee admitted he was liable for payments due within the limitations period of four years, but pleaded the statute of limitations as to payments due more than four years before the suit was instituted. The plaintiff-lessor sought to recover all defaulted payments on the ground that a landlord's action for damages after the tenant's repudiation of the lease and abandonment of the premises could not be brought prior to the expiration of the term of the lease. Therefore, argued plaintiff, no cause of action existed prior to the expiration of the lease, and the statute of limitations could not begin to run until that time as to any of the payments. Since suit was brought within four years of the expiration of the lease, plaintiff should be entitled to recover all defaulted payments. The Court of Appeals concluded that the language of the lease governed when the lessor's cause of action accrued and when suit could first be instituted. " 'When the parties by their contract provide for the consequences of a breach, lay down a rule to admeasure the damages, and agree when they are to be paid, the remedy thus provided must be exclusively followed.' " 71 P.2d at 289. Relying on language in the lease stating that the tenant was to pay any deficiency as the result of reletting "on the several rent days above specified", the Court of Appeals found that the cause of action as to each rent payment accrued at the time the rent payment became due; the statute of limitations on each rent payment began to run at the time the cause of action accrued, and, therefore, payments due more than four years prior to the institution of the suit were barred by the statute of limitations.

In *Bank of America National Trust & Savings Association, supra*, the bank brought suit to recover payments due under a promissory note. As to whether the statute of limitations began to run at the time of the first default in payments or whether the statute permitted the recovery of payments due within the limitations period, the court held as follows:

"The statute of limitations does not begin to run until the cause of action accrues, and it generally accrues when there is a remedy available. [Citation] This action accrued on [the date the first payment was due] . . . as to [that payment] . . . . . Obviously the statute of limitations is a good defense [as to that payment], as more than the statutory period had elapsed. However, when a contract fixes a time for performance, the statute of limitations does not begin to run until the expiration of that time. [Citation] Where money is payable in installments, the statute of limitations begins to run against the cause of action for the recovery of an unpaid installment at the time it is payable. *Lee v. DeForest*, 22 Cal. App.2d 351, 71 P.2d 285. Applying this rule to the circumstances of the particular case, the two year statute of limitations is no defense as to those payments which became due . . . [within the limitations period]; but it is a defense as to all installments which accrued for payment . . . [prior to two years before suit was instituted.]"

313 P.2d at 222–23.

Again the Court of Appeals relied on the language of the contract in concluding that the cause of action for default in payment accrued, and, therefore, the limitations period began to run, as to each payment at the time the payment was due. The language in this instance was the specific dates on which the payments were due. The Court of Appeals focused on this language and the rule that where a contract fixes a time for performance, the limitations period begins to run at the expiration of that time.

In the instant case the contract did not provide a specific time when payments were due. The contract was not an installment contract, at least in the sense that one party's performance consisted primarily of making regular periodic payments. Nothing in the contract, oral or written, suggests when Brown's cause of action for defendants' breach accrued. In my view, the two cases relied upon by plaintiff cannot, by any construction, be extended to cover the facts of the instant case.

Defendants rely on three cases to support their position that plaintiff's claims are time barred. *Davies v. Krasna*, 14 Cal.3d 502, 121 Cal.Rptr. 705, 535 P.2d 1161 (1975); *Donahue v. United Artists Corp.*, 2 Cal. App.3d 794, 83 Cal.Rptr. 131 (1969); and *Thompson v. California Brewing Co.*, 191 Cal.App.2d 506, 12 Cal.Rptr. 783 (1961).

*Thompson* was an appeal from the trial court's grant of a nonsuit at the conclusion of plaintiff's case at trial. The trial followed a previous appeal in which the Court of Appeals reversed the trial court's grant of demurrers without leave to amend. (*Thompson v. California Brewing Co.*, 150 Cal.App.2d 469, 310 P.2d 436 (1957).) At trial plaintiff sought to prove an implied in fact contract to pay the reasonable value for plaintiff's idea. Plaintiff alleged that, at the request of defendants, he submitted to them a new and novel idea for the advertising and promotion of defendants' beer. The submission was with the expectation, and defendants understood this to be the fact, that plaintiff would be paid the reasonable value of the idea if defendants used it. It was alleged that they did use the idea in an advertising campaign, and the reasonable value was stated to be $50,000.

The Court of Appeals affirmed the trial court's grant of the nonsuit, holding that plaintiff's cause of action was barred by the statute of limitations. The Court of Appeals reaffirmed its holding on the previous appeal that any use of plaintiff's idea without either paying for the idea or agreeing upon terms of payment would be a breach of the implied in fact contract, absent an understanding between the parties that the defendants would be allowed a free test of the idea without incurring any obligation to pay for it. Such a breach, the court had further concluded, would start the statute of limitations running. Since the suit had been instituted more than two years after the first use of plaintiff's idea, it was time barred. The second appeal, cited by de-

fendants here, in fact deals only with whether there was sufficient evidence to go to the jury on the question of a free test.

It is the holding of the Court of Appeals on the first appeal that the defendants here truly rely upon. This is significant because the cause of action alleged on the first appeal is slightly different from that alleged at the time of the second appeal. The cause of action alleged on the first appeal was "to pay the reasonable value of the idea 'if and when the defendants * * * used the same,' . . ." 310 P.2d at 440. It is this cause of action that must be compared to the causes of action alleged in the instant suit to determine whether the rule in *Thompson*, that the limitations period begins to run with the first use of the idea, also applies to the facts of the present case.

The second case relied upon by defendants, *Donahue v. United Artists Corp., supra*, was also the second appeal in the case. On the first appeal the Court reversed the trial court's grant of judgment n. o. v. in favor of defendant. The second appeal followed a retrial in which the jury again returned a verdict for plaintiffs. Plaintiffs conceived an idea for a television format which they submitted to defendant. It was expressly and impliedly agreed between the plaintiffs and defendant that if defendant used the plaintiffs' idea, it would pay for it. Defendant did use and exploit plaintiffs' format and story outlines in a television show they produced and began to show to the public in 1958. Prior to airing the program publicly, however, the defendant auditioned pilot films of the show to certain national advertising agencies representing clients who were possible sponsors. The applicable limitations period was two years. The showing of the pilot film to the agencies took place more than two years before suit was instituted, but the show was first shown publicly within two years of the filing of the suit. The issue raised on the second appeal is the same issue raised in the second *Thompson* appeal, that is, whether the initial disclosures of plaintiff's idea, here to advertising agencies, were understood by the parties to be a "test" of the idea's marketability, which did not obligate defendants to pay plaintiff for the idea and thus did not start the limitations period running. There was no dispute on the appeal that the statute of limitations for breach of a contract to pay the reasonable value for use of an idea began to run at the time of the first use of the idea without payment therefor, absent a different understanding between the parties. 83 Cal.Rptr. at 133.

The cause of action upon which Brown sues in the instant case is breach of an express oral contract to pay him a "fair share" of all profits generated from any form of commercial exploitation of the Characters he created. When the cause of action accrues on such a claim, and thus when the statute of limitations begins to run is a different issue from that raised in the second *Thompson* appeal or in *Donahue*. The issue in those cases was whether the defendants' "test" use of plaintiff's idea was a breach of an implied contract to pay the reasonable value for use of the idea. The assumption in those cases, however, and the issue decided in the first *Thompson* appeal is that the first unauthorized use of the idea without payment is a breach of the contract which starts the statute of limitations running. This holding is also distinguishable, however, from the issue presented in the instant case.

The cause of action alleged at the time of the first *Thompson* appeal was for breach of an express oral contract to pay the reasonable value for the idea if and when the defendants used it. 310 P.2d at 437, 440. This is a different claim than the instant one to pay a "fair share" of all profits earned from the commercial exploitation of plaintiff's idea. The *Thompson* claim contemplates a single payment at the time the idea is first used. The instant claim is based on the right to receive a percentage of defendant's profits as they accrue. Thus

the fact that in *Thompson* it was held that the running of the limitations period began with the first use of the idea—when full payment was then due—does not lead to the conclusion in the instant case that plaintiff's entire claim accrued at the time defendants first failed to pay him a share of the profits earned from exploitation of his idea.

The *Thompson* and *Donahue* cases leave unanswered the question whether a claim accrued each time defendants failed to pay plaintiff a "fair share" of the profits, so that the statute of limitations on plaintiff's claim for a fair share of the profits began to run with each payment received by defendants in connection with the commercializing of the Characters, and plaintiff is entitled to recover his fair share of the profits earned by defendants within the limitations period preceding the filing of the suit.

The instant case is also distinguishable from both the facts and cause of action in the third case cited by defendants, *Davies v. Krasna*, 14 Cal.3d 502, 121 Cal.Rptr. 705, 535 P.2d 1161 (1975), but I find the language and holding of that case to be significant assistance in predicting how the California Supreme Court would rule in this case.

In *Davies*, Davies' executrix brought suit for breach of confidence. In 1951 Davies submitted to defendant in confidence a story he had written. In 1954 and thereafter defendant disclosed the story to various persons in the entertainment industry in violation of Davies' confidence. Davies learned of these disclosures sometime before November 11, 1955. Defendant incorporated the idea, central theme, and dramatic core of the story into a successful play written under his own name and first produced in 1958. Suit was instituted on November 19, 1959. The trial court concluded that the suit was barred by California's two-year limitations statute governing actions "upon a contract, obligation or liability not founded upon an instrument of writing . . . ." California Code of Civil Procedure § 339(1).

After concluding that California's two-year, rather than three-year, limitations statute was properly applied to a suit for breach of confidence, the California Supreme Court proceeded to the question of when the statute began to run. The trial court concluded that defendant breached his duty of confidence before November 1955, and that the limitations period therefore commenced running on or before that date. On appeal plaintiff contended that the cause of action did not accrue until 1958 when the defendant used Davies' idea to produce a profitable play. This contention was premised on three arguments: (1) Davies' cause of action for breach of confidence did not arise until defendant publicly exhibited Davies' idea; (2) the cause of action did not arise until Davies had an effective remedy, which he first obtained in 1958; and (3) the cause of action, to the extent it seeks to impose a constructive trust, did not arise until the defendant created a trust *res* by profiting from Davies' idea.

The California Supreme Court rejected each argument:

"Plaintiff's first argument, that Davies' cause of action did not arise until defendant publicly exhibited Davies' idea in 1958, confuses two different theories of action. A suit for breach of an implied contract not to exploit an idea without paying for it does arise only with the sale or exploitation of the idea. . . . [Plaintiff's] present cause of action for breach of confidence arises upon defendant's unauthorized disclosure of the confidential idea. . . . The first unauthorized disclosure in breach of confidence occurred before November 11, 1955; thus the statute of limitations on plaintiff's cause of action for breach of confidence began to run not later than that date. . . .

Plaintiff's contention that a period of limitation should not begin to run until the injured party possesses an effective

remedy raises issues which turn upon the practical purpose that a statute of limitations serves in our legal system. The fundamental purpose of such statutes is to protect potential defendants by affording them an opportunity to gather evidence while facts are still fresh. . . . Modern adjustments in limitations law, however, have reflected concern for the practical needs of prospective plaintiffs . . . . [W]e generally now subscribe to the view that the period cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages. . . . [T]he infliction of appreciable and actual harm, however uncertain in amount, will commence the statutory period. Under present authority, neither uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations. . . . [T]he trial court expressly found that the 'disclosure of [Valentine Davies'] story . . . in 1954 by defendant Krasna to the market . . . substantially destroyed the marketability of [the] story.' This finding impels the conclusion that, by the time Davies learned of the unauthorized disclosures, he had incurred actual and appreciable damage sufficient to start the running of the period of limitation. . . . Davies, moreover, could have included in a 1955 action for actual damages a prayer for injunctive relief to bar defendant from further unauthorized disclosure or use of Davies' story. . . . [Plaintiff] cannot be permitted to rest on his rights, shifting to defendant the risk and expense attendant upon commercial exploitation of his idea, and then assert his claim only when that exploitation had yielded a net profit. . . .

Plaintiff thirdly and finally asserts that, for want of a res, the remedy of constructive trust was not available to Davies until 1958 . . . . This argument overlooks the principle that 'The statute of limitations to be applied is determined by the nature of the right sued upon, not by the form of the action or the relief demanded.' "

535 P.2d at 1167–70 (footnotes and citations omitted).

The obligation in the instant case is to pay a fair share of the profits from use of the plaintiff's idea. The breach occurred when there was a failure to pay a fair share of the first profits earned. *Davies* suggests that this should start the limitations period for recovering all future profits since there certainly could have been subsequent breaches of confidence in *Davies* as well. Moreover, the behavior of the defendants was such that the first breach by them was clear notice to plaintiff that they intended to breach the entire contract. *See Sweet v. Watson's Nursery*, 23 Cal.2d 379, 73 P.2d 284 (1937). *See also Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288, 292–93 (9th Cir. 1969).

The use of plaintiff's Characters substantially destroyed their value to him. That is, once defendants appropriated plaintiff's Characters for use in the television series and other markets, plaintiff was unable to sell them as characters with different names and personalities that other commercial interests might exploit. Thus, as in *Davies*, at the time of the breach plaintiff here had suffered "appreciable and actual harm" because the Characters' value to him was substantially destroyed. Brown had as effective a remedy as Davies at the time of the breach. He could have sued for his share of the profits, for an accounting of any future profits, and/or for an injunction to prohibit future exploitation of the Characters without some assurance that Brown would receive his "fair share."

As in *Davies*, permitting Brown to delay suit until after defendants had found a highly profitable market for the Characters would allow him "to rest on his rights,

shifting to defendant[s] the risk and expense attendant upon commercial exploitation of his idea, and then [to] assert his claim only when that exploitation had yielded a net profit." *Davies* condemned this. 535 P.2d at 1170.

Finally, *Davies* indicates that the uncertainty and difficulty in proving damages at the time of the breach is no reason to delay the running of the statute, that the unforeseeability of the amount and even the source of profits from commercialization of plaintiff's Characters does not excuse plaintiff from filing suit within the limitations period following the first exploitation of the Characters and failure to pay him a "fair share" of the profits.

In light of the above, I believe the California Supreme Court would hold in the instant case that the first failure of defendants to pay plaintiff a "fair share" of the profits from any commercial exploitation of the Characters would give rise to the only cause of action for breach of the contract to pay defendant a "fair share," and would, therefore, start the running of the statute of limitations for any claim to receive a "fair share" of the profits from commercialization. At the time defendants first failed to account to plaintiff for his "fair share" of profits from the commercial exploitation of the Characters, plaintiff had a true cause of action, and the accrual of that cause of action started the running of the limitations period. Plaintiff's memorandum states that there has been a commercial exploitation of his Characters since 1972 or 1973, and that he has not participated in the profits. Memorandum at 2–3. Plaintiff sues on an admittedly oral contract, thus the two year limitations period of California Code of Civil Procedure § 339(1) is applicable. The instant suit was not filed until October 28, 1976, more than two years after plaintiff's cause of action for breach of the oral contract accrued. Plaintiff's claims for breach of contract are, therefore, time barred.

### III. Claims for Breach of Fiduciary Relationship, Fraud and Conspiracy

The motion to dismiss by Cosby, Jemmin, Filmation, *et al.* seeks to have any claim of plaintiff for breach of fiduciary relationship, fraud, or conspiracy dismissed on grounds that plaintiff has failed to state a claim for any of these causes of action, and that even if he has, they are also barred by the applicable statute of limitations.

■ The factual allegations in paragraphs 15 through 41 of plaintiff's Complaint are captioned "Allegations as to Contractual Rights, Unjust Enrichment, Breach of Fiduciary Relationship, Fraud and Conspiracy." Those allegations, however, contain no facts which could possibly amount to a cause of action for fraud, conspiracy or breach of a fiduciary relationship. "Although all well pleaded material averments of the complaint are admitted on a motion to dismiss, unsupported conclusions of fact and conclusions of law are not admitted. . . . The plaintiff cannot avoid the requirement that his pleading contain 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Federal Rule of Civil Procedure 8(a)(2), by using a conclusory averment of conspiracy." *Weiner v. Bank of King of Prussia*, 358 F.Supp. 684, 693 (E.D.Pa.1973). Plaintiff's memorandum in response to the motion to dismiss makes no effort to rebut the argument that the Complaint fails to allege facts sufficient to state causes of action for fraud, conspiracy, or breach of fiduciary relationship. I conclude that plaintiff's Complaint states no cause of action for fraud, conspiracy, or breach of fiduciary relationship.

■ Even if plaintiff were permitted to amend his Complaint, and he was able to allege sufficient facts to state claims for fraud, conspiracy or breach of fiduciary relationship, these claims would be barred by the applicable California statute of limita-

tions. A cause of action for breach of a fiduciary relationship is governed by California's three-year statute of limitations, Code of Civil Procedure § 338(4). *See Davies v. Krasna, supra* at 1165–66. A cause of action for fraud is also governed by the three-year limitations period of § 338(4). *Id.* at 1165. In order to maintain a cause of action for civil conspiracy, there must be an act in furtherance of the conspiracy, which is itself a tort. *Selby Realty Co. v. City of San Buenaventura*, 10 Cal.3d 110, 109 Cal. Rptr. 799, 810, 514 P.2d 111, 122 (1973). Any such cause of action would be governed by California's two-year limitations period of the Code of Civil Procedure § 339(1) as a tort action not within the scope of other limitations sections. *See Davies v. Krasna, supra* at 1166 n. 6. The statute of limitations for any of these causes of action would have begun to run as soon as the plaintiff reasonably could have discovered the fraud, conspiracy and breach of fiduciary duty. Although fraud, conspiracy and breach of fiduciary relationship may be continuing torts, the limitations period is uniformly held to begin running with the initial discovery of the actionable wrong. Moreover, the reasoning which led to the conclusion that the limitations period for the contract claim began running with the initial breach is equally applicable here. Since the time of the first breach of the oral contract defendants have been openly and notoriously exploiting plaintiff's Characters. This is sufficient to start the running of the limitations period for each of the above causes of action. More than three years have passed since that time, and, therefore, each of the above claims is barred.

## IV. *Claims for Copyright Infringement and Unlawful Appropriation*

The motion to dismiss also seeks to have plaintiff's cause of action for copyright infringement and unlawful appropriation dismissed on the ground that the Complaint fails to state a cause of action and the claims are barred by the applicable statute of limitations. Defendants argue that where one person employs another to produce work of an artistic nature, in the absence of a contractual reservation of the copyright in the artist, the presumption arises that title to the copyright is in the employer, and that plaintiff was employed in just such circumstances as shown by the contract appended to the Complaint:

> "While you [plaintiff] are rendering your services hereunder as an independent contractor, you nonetheless acknowledge that we [Jemmin] shall be entitled to and shall solely and exclusively own, in addition to your services, all of the results and proceeds thereof as though you were our employee-for-hire, including but not limited to all rights throughout the world of copyright, trademark, patent, production, manufacture, recordation, reproduction, transcription, performance and exhibition by any medium now known or hereafter discovered."

Therefore, say defendants, plaintiff has admitted in his own pleadings that he has no copyright claim in the Characters.

■ Defendants are correct in their statement of the law. *See Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2d Cir. 1966); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298 (9th Cir. 1965); Nimmer on Copyright § 62.- 1. There is also support for the position, however, that if the employer materially breaches the employment contract, the employee may rescind the contract and claim back the rights to the copyright. Nimmer on Copyright § 62.5. The allegations of plaintiff's Complaint clearly include facts amounting to a material breach by Jemmin and Cosby, and if plaintiff is entitled to rescind and reclaim the copyright, the Complaint clearly states a cause of action for copyright infringement.

Although plaintiff has stated a claim for copyright infringement, this claim and any claim for unlawful appropriation is barred

by the statute of limitations. Plaintiff can only succeed on his claim for copyright infringement or unlawful appropriation if he is able to prove that defendants breached their contract with him. The statute of limitations on plaintiff's claim for breach of contract has run, however, and, therefore, plaintiff is precluded from proving a breach of the contract. Without being able to prove a breach of the contract, plaintiff cannot prove that he has any right to reclaim his copyright interest in the Characters. Thus the limitations bar on plaintiff's contract claim also bars his claim for copyright infringement or unlawful appropriation.

## V. *Personal Jurisdiction Over Schimer and Prescott*

The motion to dismiss of defendants Schimer and Prescott under Fed.R.Civ.P. 12(b)(2) and (4) is on the single ground that there is no basis for the court's assertion of personal jurisdiction over them.[2] They argue that the only possible basis for personal jurisdiction over them is their doing business in Pennsylvania, 42 P.S. §§ 8304, 8309, and they claim that they have never done business individually in Pennsylvania.

 Plaintiff responds that the appearance of Schimer and Prescott's names as "Executive Producers" at the beginning or end of each Saturday morning segment of "Fat Albert and The Cosby Kids," which is televised nationally, including in Pennsylvania, is sufficient to meet the doing business requirement of the Pennsylvania long-arm statute. I disagree. The business activities of Schimer and Prescott as individuals must be distinguished from their business activities through Filmation or on behalf of Filmation. Activities on behalf of Filmation are not relevant to a finding of *in personam* jurisdiction over them as individuals under

§ 8304. *Miller v. American Telephone & Telegraph Co.*, 394 F.Supp. 58, 62 (E.D.Pa. 1975), *aff'd*, 530 F.2d 964 (3d Cir. 1976). Schimer and Prescott submitted affidavits stating that they had never individually done any business in Pennsylvania. At oral argument plaintiff's attorney conceded that they had no evidence to contradict the contents of defendants' affidavits. (Notes of Argument at 19–20). Whatever role Filmation may have had in the distribution and televising of the television series, Schimer and Prescott played no part in this in their individual capacities. The inclusion of their names on the series as "Executive Producers" can at most be considered a form of indirect advertising. It cannot, by any stretch of the imagination, constitute doing business in Pennsylvania. In this age of electronic media, where a single picture instantaneously reaches millions of persons, we must be wary of imposing obligations on individuals for actions that would seem by all counts to be completely insignificant were it not for the disproportionate reach of television. The display of their names, even to millions of viewers, as Executive Producers does not amount to activity " 'so continuous and substantial as to make it reasonable' for the trial court to exercise jurisdiction over [them] . . . ." 394 F.Supp. at 63. I conclude, therefore, that this Court lacks personal jurisdiction over Schimer and Prescott, and their motion to dismiss for lack of jurisdiction will be granted.

---

2. Since I have concluded that all of plaintiff's claims are barred as to all defendants by the applicable statute of limitations, it makes no practical difference whether the Court has jurisdiction over Schimer and Prescott. This issue is a jurisdictional one, however, and in line with the requirement that jurisdictional issues be considered first (even though here the other issues must be resolved regardless of how the jurisdictional issue as to Schimer and Prescott is answered), I will consider whether this Court could properly exercise jurisdiction over them.