[Civ. No. 66885. Second Dist., Div. Seven. Oct. 5, 1983.]

APRIL ENTERPRISES, INC., Plaintiff and Appellant, v.
KTTV et al., Defendants and Respondents.

## COUNSEL

Hurley & Grassini, Hurley, Grassini & Wrinkle, Ronald Wrinkle and Lawrence P. Grassini for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Dean Stern and Jeffrey R. Kelleher for Defendants and Respondents.

## OPINION

**JOHNSON, J.**—The plaintiff, April Enterprises, (April) appeals from a judgment dismissing its complaint without leave to amend. Three issues are presented on appeal: first, whether plaintiff has pleaded a cause of action for breach of the implied covenant of fair dealing in a contract; next, whether plaintiff has pleaded a cause of action for breach of fiduciary duty of a joint venturer; and, finally, whether either cause of action is barred by applicable statutes of limitations. We hold, first, appellant's complaint sufficiently alleges both causes of action; and, secondly, the statute of limitations was tolled on both causes of action until appellant reasonably could have discovered the injury at issue.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

In 1965 appellant entered into a written contract with respondents, KTTV and Metromedia, Inc., (Metromedia/KTTV) for production of the "Winchell-Mahoney Time" television show (hereinafter referred to as the show.) The contract set forth the rights of the parties with respect to the show's production and syndication. Under section 4 of the agreement respondents

---

[1]Since this appeal is based on judgments on the pleadings and of nonsuit on the opening statement, the allegations of the complaint and opening statement are assumed to be true. Consequently, many of the "facts" recited in this opinion will be subject to proof in later proceedings.

owned all of the videotapes of the show. Section 17, dealing with future syndication, provided that both parties had the right to initiate syndication of the show with third parties and that each party was to receive 50 percent of the net profits from any resulting syndication. Subsection C of section 17 provided respondents could erase the videotape of each show six months after its original broadcast.

In 1968 respondents sent appellant a new contract which, if accepted, would implement the syndication clause of the 1965 contract by conferring upon respondents the exclusive right to initiate syndication for a limited period of time. Appellant signed the contract and returned it to respondents.

The new 1968 contract altered the rights of the parties in several respects. With respect to respondents, they no longer had the right to erase the videotapes of the show. They had the exclusive right to initiate syndication but that exclusivity was limited to the time in which the contract remained in effect. It follows that under the new agreement appellant could not initiate syndication at all.[2] Also, appellant's compensation was changed: the 1968 contract provided that appellant would be paid 20 percent of the syndication revenue, rather than the 50 percent compensation appellant was to receive under the earlier agreement.

The 1968 contract provided for automatic termination in five years, or earlier if the shows were not broadcast for a certain period of time.

April alleges that some time in 1969 it attempted to negotiate syndication agreements with various third parties and in that connection offered to purchase the videotapes of the show from respondents. We assume these negotiations were entered even though April had no right to initiate syndication while the 1968 contract remained in effect.

Between November of 1969 and March of 1970, presumably in response to April's efforts to purchase the tapes, respondents wrote two letters to appellant offering to buy the exclusive rights to broadcast and license the show for another two years on terms different from those in the 1968 contract. In the second of the two letters, dated March 31, 1970, respondents also warned appellant the videotapes would be erased unless appellant accepted respondents' new terms. There is no record of any response by appellant to these letters.

Appellant alleges that in 1976 it discovered the video tapes had actually been erased at some unknown date. Shortly after this discovery, appellant

---

[2]As we explain later, however, once the 1968 contract expired April's rights to initiate syndication were reinstated.

filed suit. The first amended complaint set forth three causes of action: breach of contract; breach of fiduciary duty of a joint venturer; and intentional interference with prospective advantage. Appellant is no longer pursuing the third cause of action.

Respondents demurred on two grounds: (1) the complaint failed to state a cause of action for breach of fiduciary duty or for breach of contract; and (2) both causes of action were barred by the statute of limitations. The demurrer was overruled.

At trial respondents moved for a judgment on the pleadings on basically the same grounds as the demurrer. This motion initially was denied. After rejecting appellant's proposed second amended complaint, however, the court reversed itself and granted the motion as well as respondents' motion for a judgment of nonsuit after appellant's opening statement.

### Discussion

We consider first the standard of appellate review applicable where motions for judgment on the pleadings and judgment of nonsuit on the opening statement have been granted. ■ It is well settled that review of a judgment on the pleadings is confined to the face of the pleading under attack and all facts alleged in the pleading must be accepted as true. (*Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 714 fn. 3 [117 Cal.Rptr. 241, 527 P.2d 865]; *Baillargeon* v. *Department of Water and Power* (1977) 69 Cal.App.3d 670, 675-676 [138 Cal.Rptr. 338].) ■ Similarly, review of a judgment of nonsuit on the opening statement accepts as proved all of the facts alleged in the opening statement and "must indulge in all favorable inferences reasonably arising from those facts." (*Smith* v. *Roach* (1975) 53 Cal.App.3d 893, 897 [126 Cal.Rptr. 29] citing *Cole* v. *State of California* (1970) 11 Cal.App.3d 671, 674 [90 Cal.Rptr. 74]; *Timmsen* v. *Forest E. Olson, Inc.* (1970) 6 Cal.App.3d 860, 867-868 [86 Cal.Rptr. 359].)

In its first amended complaint appellant alleges breach of the 1965 contract only. In counsel's opening statement, however, reference is made to both the 1965 and the 1968 agreements.[3] Thus, for purposes of reviewing the order granting judgment on the pleadings we consider only the earlier agreement and accept all matters pleaded as true. (*Sullivan* v. *County of Los Angeles, supra,* 12 Cal.3d 710, 714 fn. 3.) For purposes of reviewing the judgment of nonsuit, however, we consider both agreements, accept as true all facts stated in counsel's opening statement, and draw all reasonable in-

---

[3]The 1968 agreement also is alleged in the second amended complaint tendered by the plaintiff at trial but rejected by the trial judge.

ferences in favor of appellant. (*Smith* v. *Roach, supra,* 53 Cal.App.3d 893, 897-898.)

## I. Appellant Has Stated a Cause of Action for Breach of Implied Covenant of Fair Dealing.

### A. *Judgment on the Pleadings.*

■ Appellant contends respondents' erasure of the tapes constituted a breach of the implied covenant of fair dealing in a contract. By erasing the tapes, according to appellant, respondents interfered with appellant's right under the terms of the 1965 contract to profit from future syndication of the show. Respondents counter by pointing out the 1965 agreement contained an express clause giving them the right to erase the tapes. Accordingly, the general rule should apply that where an unambiguous contract contains an express covenant a court may not imply a covenant which would override it. (*Witt* v. *Union Oil Co.* (1979) 99 Cal.App.3d 435, 441 [160 Cal.Rptr. 285].)

■ The traditional rule, as respondents suggest, is to the effect a covenant of fair dealing will not be implied to vary the terms of an unambiguous contract. In the case of a contradictory and ambiguous contract, however, the implied covenant may be applied to aid in construction. (*Milstien* v. *Security Pac. Nat. Bank* (1972) 27 Cal.App.3d 482, 487 [103 Cal.Rptr. 16].)

Moreover, it is implied in law that a party to a contract will not do anything which would deprive the other party of the benefits of the contract. "This implied covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." (*Harm* v. *Frasher* (1960) 181 Cal.App.2d 405, 417 [5 Cal.Rptr. 367]; *Vale* v. *Union Bank* (1979) 88 Cal.App.3d 330, 336 [151 Cal.Rptr. 784]; 1 Witkin, Summary of Cal. Law, (8th ed. 1973) Contracts, § 576, p. 493.)

■ Here, we find the terms of the 1965 contract to be inherently contradictory. Uncertainty arises when subsection (C) of the syndication clause is read together with the preceding subsections. Taken literally, the contract would allow *respondents* to erase a videotape either at the same time appellant was negotiating a syndication agreement, or after such an agreement had been reached. Obviously it would be senseless for appellant to negotiate syndication if it could not be assured availability of the tapes.

These conflicting terms of the 1965 contract can be reconciled by construing the erasure clause to be limited by the implied covenant of fair dealing. As so qualified respondents' right to erase the tapes would be limited to the situation where future syndication was not feasible. This limitation insures that appellant is not deprived of the rights to future syndication, bargained for under the contract.

Although at trial extrinsic evidence may explain the apparent contradictions between these terms in some way which favors an absolute unqualified right to erase the tapes, at this stage of the proceedings our review is limited to the complaint and the language of the contract. Accordingly, we hold appellant has stated a cause of action for breach of implied covenant of fair dealing based on the 1965 contract, and the trial court's judgment on the pleadings was error.

B. *Judgment of Nonsuit.*

We turn now to the 1968 agreement, mention of which was made by appellant's counsel in his opening statement. The trial court's order of nonsuit implies it found the 1968 agreement an insufficient predicate for a cause of action.[4] ■ ■■■ Consequently, we address the relevance of that agreement to the issues in this case.[5]

■ The 1968 syndication contract contains an integration clause, clearly indicating it implemented and superseded the provisions for syndication in

---

[4]Since we reverse the judgment, appellant will have the opportunity to amend and may choose to incorporate the 1968 agreement into the complaint.

[5]Respondents, without elaboration, suggest on appeal that the 1968 agreement was unexecuted since it was never signed by them. By the veiled reference to lack of execution in their brief on appeal, respondents apparently mean to raise the statute of frauds as a defense. (Civ. Code, § 1624.) Despite the parties' inability to produce a signed copy of the 1968 contract, however, on the allegations and facts properly before this court respondents' statute of frauds defense would be barred by the doctrine of equitable estoppel. "Where the defendant by his words or conduct represents that he proposes to stand by . . . [his] contract, and the plaintiff, in reliance thereon, changes his position, the defendant will be *estopped* to set up the bar of the statute [of frauds]." (Italics in original.) (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 250, pp. 217-218.)

Here, respondents prepared the 1968 contract on their own stationery and submitted it to appellant for signature. Appellant then *signed and returned it to respondents.* In addition, during oral argument before this court respondents' counsel admitted the parties performed according to the terms of the 1968 contract in that when respondents and their licensees broadcast the show appellant received compensation of 20 percent of the gross receipts according to the terms of the 1968 contract rather than 50 percent of the profits appellant was to receive according to the terms of the 1965 contract. By accepting the lesser compensation appellant materially altered his position. Moreover, respondents relied upon the 1968 contract in their original answer and incorporated it by reference in that pleading. In addition, respondents' counsel admitted the contract indeed may have been executed even though neither party has been able to produce a signed copy of it. Although subsequent proceedings may adduce evidence to the contrary, on the allegations and facts presently before this court respondents would be estopped from denying execution of the 1968 contract.

the 1965 contract. It differs from the earlier agreement in one important respect: it does not give respondents any specific right to erase the tapes even though respondents still had exclusive ownership of them. Indeed April alleges it specifically bargained for removal of that clause. In addition, section 4 of the contract—". . . KTTV shall not have the right to enter into any licensing agreement after the termination or expiration of this agreement"—implies that respondents exhausted their rights to initiate syndication at the termination of the 1968 contract while April retained its rights to do so. Indeed, the evidence at trial may show that appellant acquired exclusive rights to syndicate the show no later than 1973 when the 1968 agreement automatically terminated.

Construing the 1968 agreement as we do, in a light most favorable to appellant, respondents' erasure of the videotapes deprived appellant of the benefit of the bargain under the agreements with Metromedia/KTTV, that is, rights to initiate future syndication of the show and receive compensation therefor. This supplies facts necessary for a breach of the implied covenant of fair dealing cause of action. (*Harm* v. *Frasher, supra,* 181 Cal.App.2d 405, 417; *Vale* v. *Union Bank, supra,* 88 Cal.App.3d 330, 336.) Indeed, if the evidence at trial establishes that Metromedia had exhausted its own syndication rights, conferred by the 1968 contract, and then deprived April of its reversionary rights by destroying the tapes, Metromedia's acts might amount to an aggravated breach of the covenant of fair dealing. Consequently, granting the motion for nonsuit was also error.

II. APPELLANT HAS ALSO STATED A CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY BY A JOINT VENTURER.

A. *Judgment on the Pleadings.*

In its complaint appellant alleged that the negotiations leading to creation of the 1965 contract created a joint venture. In the opening statement counsel also referred to the 1968 contract. April's position apparently is that both the 1965 and 1968 contracts merely implemented an over-arching oral joint venture arrangement between the parties.

Respondents contend neither contract, nor any oral agreement, created a joint venture; they proffer two arguments in support of this contention. First, the clause in the 1965 contract labelling appellant as an independent contractor coupled with the contract's integration clause negates the existence of a joint venture. And, second, the contract taken as a whole details the rights and duties of the parties in such a fashion that it negates every element necessary to the creation of a joint venture. We disagree.

■ "A joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." (*Nelson* v. *Abraham* (1947) 29 Cal.2d 745, 749 [177 P.2d 931].) ■ The elements necessary for its creation are: (1) joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to joint control. (*County of Riverside* v. *Loma Linda University* (1981) 118 Cal.App.3d 300, 313 [173 Cal.Rptr. 371]; *Holtz* v. *United Plumbing & Heating Co.* (1957) 49 Cal.2d 501, 506-507 [319 P.2d 617].) "Such a venture or undertaking may be formed by parol agreement [citations], or it may be assumed as a reasonable deduction from the acts and declarations of the parties [citations]." (*Nelson* v. *Abraham, supra,* 29 Cal.2d 745, 749-750.) Whether a joint venture actually exists depends on the intention of the parties. (*County of Riverside* v. *Loma Linda University, supra,* 118 Cal.App.3d 300, 313; *Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 764-765 [128 Cal.Rptr. 665].)

■ Here, it cannot be determined as a matter of law that the complaint fails to allege facts supporting creation of a joint venture. Appellant argues that the common enterprise to seek syndication of the show after it was produced and originally telecast was a joint venture and we find that the first amended complaint sufficiently alleges such a relationship. The requisite joint interest in a common business is supplied by the allegations that the parties planned to coproduce the shows in order to exploit the market for its syndication and that each contributed its own unique talents in furtherance of this objective. The requisite joint control is supplied by the allegation that each party agreed to have equal rights to initiate syndication of the show.

We also disagree with respondents' assertion that the requirement of sharing profits and losses is not met in the instant case. The 1965 contract provides that April and Metromedia each receive 50 percent of the profit derived from any syndication of the show. April alleges in its complaint that the parties also intended to share losses in the same proportion. Since the intention to share losses may be inferred from a contract provision to share profits, (*Holtz* v. *United Plumbing & Heating Co., supra,* 49 Cal.2d 501, 507; *Fitzgerald* v. *Provines* (1951) 102 Cal.App.2d 529, 536 [227 P.2d 860]) the joint venture action is not defeated by the 1965 contract's failure to specifically provide for the unlikely eventuality that syndication of the show would be a losing proposition. Moreover, where a joint venture involves the contribution of capital by one party and services by the other, neither party is required to reimburse the other for losses sustained. In the event of loss, the party contributing capital loses his capital and the one contributing labor loses the value of his efforts. (*Kovacik* v. *Reed* (1957) 49 Cal.2d 166, 169 [315 P.2d 314]; 6 Witkin, Summary of Cal. Law (8th ed.

1974) Partnership, § 17, p. 4269.) Consequently, if the evidence at trial establishes that in practical effect the parties intended to share losses even though April's losses would be in the form of loss of its labor and Metromedia's would be in the form of lost capital, the difference in the type of loss sustained would not defeat a finding of joint venture.

Respondents next argument, that the contract's labelling of appellant as an independent contractor forecloses a finding of joint venture, fails since the conduct of the parties may create a joint venture despite an express declaration to the contrary. (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, *supra*, 20 Cal.2d 751, 765.)

We note that where evidence is in dispute the existence or nonexistence of a joint venture is a question of fact to be determined by the jury. (*San Francisco Iron & Metal Co.* v. *American Milling & Industrial Co.* (1931) 115 Cal.App. 238, 245-246 [1 P.2d 1008].) Consequently, whether a joint venture was actually created in the instant case is a question of fact to be decided at trial. (*Nelson* v. *Abraham, supra*, 29 Cal.2d 745, 750; *Smalley* v. *Baker* (1968) 262 Cal.App.2d 824, 837-838 [69 Cal.Rptr. 521]; *County of Riverside* v. *Loma Linda University, supra*, 118 Cal.App.3d 300, 313.) For purposes of this appeal, however, we hold the complaint alleged facts sufficient to support a cause of action for breach of fiduciary duty of a joint venturer.

B. *Judgment of Nonsuit.*

■ Respondents nevertheless contend that any joint venture that may have been created by the 1965 contract was negated in 1968 because the agreement entered into that year gave Metromedia the exclusive right to license and syndicate, thereby removing the requisite control from appellant.[6] It also provided that appellant would be paid on the basis of gross receipts, and, according to respondents, if the parties intended to share losses as well as profits appellant would have been paid on the basis of net receipts. We address these arguments as they relate to the order granting respondents' motion for nonsuit.

As we noted earlier, our view of the 1968 contract is that it merely implemented the earlier joint venture during the period in which it remained in effect. Moreover, the 1968 contract strengthens appellant's assertion of an oral agreement of joint venture if it is construed as representing a written

---

[6]According to the terms of the 1968 contract, however, Metromedia's exclusive rights to initiate syndication were time limited. Metromedia had exclusive rights only until the 1968 contract expired. Once that happened Metromedia's exclusive syndication rights were exhausted and April was left with the remaining rights to initiate syndication of the show.

implementation of decision to "take turns" syndicating the show, i.e., respondents had exclusive rights to syndicate until the 1968 agreement terminated, at which time exclusive rights to initiate syndication vested in April.

A joint venture continues until the purpose for which it was formed has been accomplished or it is expressly extinguished. (*Elias* v. *Erwin* (1954) 129 Cal.App.2d 313, 317 [276 P.2d 848]; *San Francisco Iron & Metal Co.* v. *American Milling & Industrial Co.* (1931) 115 Cal.App. 238, 248 [1 P.2d 1008].) And a subsequent agreement between joint venturers which merely provides for a different distribution of profits does not change the relationship unless it also expressly extinguishes the earlier agreement. (*Ford & McNamara Inc.* v. *Wilson* (1931) 119 Cal.App. 475, 480-481 [6 P.2d 996]; see also 40 Cal.Jur.3d, Joint Ventures, § 8, p. 190, fn. 53.)

There is no evidence before this court that one of the purposes of the joint venture—to exploit the market for syndication of the television show—has been accomplished. Indeed, the 1968 agreement evidences the parties intended to "take turns" initiating syndication, with April's turn coming after the 1968 contract terminated. Neither is there evidence of express extinguishment. Thus, the 1968 agreement, absent evidence that may be introduced at trial to the contrary, does not defeat the cause of action based on joint venture and granting the judgment of nonsuit was also error.

III. APPELLANT'S CAUSES OF ACTION ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.

Analyzing respondents' statute of limitations defense requires three independent inquiries. First, we must decide on what date April suffered injury sufficient to begin accrual of the causes of action asserted here. Secondly, we consider whether the breach of fiduciary duty action accrued on the date of injury or whether the discovery rule applies so that accrual was delayed until April could reasonably have ascertained the injury. Finally, we examine whether the discovery rule also applies to the breach of contract action.

A. *Date of Breach and Injury.*

Respondents assert the statute of limitations as a defense by first characterizing the harm about which appellant complains as the deprivation of syndication rights and then asserting that appellant suffered such harm no later than March 31, 1970. On that date, in response to appellant's own efforts to purchase the tapes and syndicate the show, respondents wrote a

letter to appellant refusing to sell the videotapes of the show to appellant and incidentally threatening to erase the tapes.

This argument fails for two independent reasons: it ignores the plain language of the 1968 contract which reveals that appellant had no present right to syndication, and thus no cause of action in 1970; and it mischaracterizes the gravamen of appellant's complaint.

Assuming the 1968 contract was still in effect,[7] the relationship between the parties on March 31, 1970, was as follows. The 1965 contract governed all rights and liabilities of the parties with respect to all aspects of the "Winchell-Mahoney Time" show except those rights and liabilities relating to syndication and, by implication, respondents' former rights of erasure. The rights to initiate future syndication, vested in appellant by the 1965 contract, had been temporarily suspended by the subsequent contract, formed in 1968. That agreement gave respondents exclusive rights to syndicate the show until February 11, 1973.

In 1969, perhaps dissatisfied with respondents' failure to vigorously pursue their exclusive rights to initiate syndication under the 1968 contract, April began negotiations with various third parties relating to syndication of the show. At that time, of course, April had no legal right to initiate or consummate a syndication agreement under the terms of the contracts with respondents. Presumably April hoped that if an attractive deal could be arranged, respondents would renegotiate the provision in the 1968 contract giving them a five-year exclusive right to syndicate. By their March 31, 1970, letter, however, Metromedia/KTTV rejected April's efforts. In effect they were holding April to the terms of the contract, which on the basis of the complaint and the plain language of the two contracts, they had every right to do at that time.

This reenactment of events reveals the fallacy in respondents' argument. " 'A cause of action accrues at the moment the party who owns it is entitled to bring and prosecute an action thereon.' " (*Howe* v. *Pioneer Mfg. Co.*

---

[7]The 1968 contract, according to its terms, terminated on February 11, 1973. During that period it was automatically renewed from one contract year to another unless Metromedia failed to broadcast a specified number of shows during the preceding contract year. In that event the agreement would expire at the beginning of the next contract year and the provisions giving Metromedia the exclusive right to syndicate the show would no longer be in effect. For purposes of this appeal, we assume the contract remained in effect until 1973 since nothing in appellant's first amended complaint or opening statement reveals the contract would have terminated earlier due to Metromedia's failure to broadcast the specified number of shows. Indeed the second amended complaint April tendered to the trial court alleged the 1968 agreement was in full force and effect at least through 1970 during the time Metromedia sought to impose a new, less favorable contract.

(1968) 262 Cal.App.2d 330, 339-340 [68 Cal.Rptr. 617].) According to Metromedia/KTTV, appellant should have filed suit for denial of syndication rights in 1970. However, had appellant done so respondents could have pleaded the 1968 contract as a complete defense. In 1970 appellant's rights to initiate syndication were temporarily suspended; thus, appellant had no actionable claim at that time.

Should the evidence at trial establish the 1968 contract had terminated by 1970, however, Metromedia/KTTV's argument fails for another reason. They also miscast the *type* of harm about which appellant complains. In that connection Metromedia argues the holding in the case of *Davies* v. *Krasna* (1975) 14 Cal.3d 502 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807] should be applied to defeat appellant's claims. That case involved the unauthorized disclosure of the plaintiff-writer's story by his producer. Our high court held the statute of limitation began to run on plaintiff's cause of action for breach of confidence when the plaintiff first learned of his producer's unauthorized disclosures because that was the moment plaintiff first suffered "appreciable harm." Consequently, his suit, brought only after the story was transformed into a successful screenplay, was time barred. The court explained: "Plaintiff's first argument, that Davies' cause of action did not arise until defendant publicly exhibited Davies' idea in 1958, confuses two different theories of action. . . . [The] present cause of action for breach of confidence arises upon defendant's unauthorized disclosure of the confidential idea. . . . The first unauthorized disclosure . . . occurred before November 11, 1955; thus the statute of limitations on plaintiff's cause of action for breach of confidence began to run not later than that date." (*Id.,* at pp. 511-512; citations and fn. omitted.)

The reasoning of the court in *Davies* suggests that if the contract in that case had been one in which the parties agreed to share profits from any commercial exploitation of the plaintiff's story, appreciable harm would not have been suffered until after the play had been produced and profits earned. Since the parties agreed only that plaintiff's story would not be divulged to others, however, appreciable harm was suffered and the limitations period ran from the date of first disclosure.

Respondents' argument in this case fails for the same reason the plaintiff's argument in *Davies* failed: they confuse two different theories of action. Appellant is not suing for respondents' failure to cooperate with efforts to syndicate the show in 1969 or 1970. Rather, appellant's action is based on suffering harm amounting to the lost opportunity to syndicate the television show ever, under any circumstances.[8]

---

[8]Respondents also cite *Brown* v. *Cosby* (E.D.Pa. 1977) 433 F.Supp. 1331, to support their contention that April suffered appreciable harm in 1970. The federal district court in *Brown*

April did not possess merely a right to a single syndication deal. Rather it had a continuing right to pursue a succession of syndications. Even had Metromedia "cooperated" with April's alleged tender of syndication opportunities in 1969 or 1970 those syndication deals would have been with certain stations for a certain period of time. Long before 1976 those agreements probably would have expired. The syndication clause of the 1965 contract is consistent with April possessing a right to arrange new syndications with those same stations for future periods and to pursue additional syndications with other stations which had never participated in these deals. Thus, the harm April suffered when the tapes were erased was not the loss of a single syndication deal which allegedly was tendered and rejected in 1969 or 1970. Even had that deal been consummated and April had received its benefits under that contract, April would be suffering the harm it now claims in its present cause of action—the lost opportunity to pursue other syndication deals in the future. It is one thing to deprive plaintiff of some golden eggs; it is quite another to kill the goose.

Accordingly, assuming the 1968 contract had terminated, thus resurrecting appellant's right to initiate syndication, the parties' inability to reach agreement in 1969 or 1970 on the terms for implementing appellant's syndication rights only delayed April's ability to reach syndication agreements with third parties. But respondents' erasure of the tapes did not merely delay appellant's rights to receive the benefits of the contract. Instead it foreclosed April from ever being able to implement the syndication clause and thereby reap the benefits of the bargain struck with respondents. ▮▮ ▮▮ ▮▮ ▮▮ Thus, the first arguably actionable event was respondents' erasure of the tapes[9] since that was the moment appellant suffered appreciable harm for purposes of the causes of action asserted in this lawsuit.[10]

---

held the plaintiff in that case suffered appreciable harm when the defendants first refused to pay him his fair share of the profits earned from commercial exploitation of plaintiff's cartoon characters. (*Id.*, at p. 1342.) Accordingly, the limitations period on plaintiff's action for failure to pay him a fair share of profits began to run when defendants first used the cartoon characters without paying plaintiff his fair share. (*Ibid.*) *Brown* fails to support respondents for the same reasons stated in the text that the *Davies* case is inapplicable. The failure to pay fair profits is not the same cause of action—nor the same harm—as would be destruction of the cartoon characters themselves.

[9]Neither of the parties knows exactly when the tapes were erased, although respondents apparently now believe most of them were destroyed in or about July 1972.

[10]Our disposition of this issue also makes it clear that we reject respondents' claim that the threats contained in the March 1970 letter constituted a repudiation of the joint venture relationship. Although a repudiation of a joint venture agreement does begin the running of the statute of limitations on an action for breach of the agreement, the acts of repudiation must be clear and unequivocal. (*Wilton* v. *Clarke* (1938) 27 Cal.App.2d 1, 4 [80 P.2d 141]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 631, p. 538.) Here, the alleged acts of repudiation were made while respondents were attempting to secure a new contract to telecast and license the show. A threat to erase, made during the course of such negoti-

B. *On the Face of the Relevant Pleadings, the Cause of Action Is Not Time Barred Even Applying the Time of Injury Rule.*

██ We now turn to the question of whether the action on the breach of the implied covenant is barred because the tapes were allegedly erased in 1970 or 1972. ██ First of all, we must recall that the case is on appeal from a judgment on the pleading. Therefore, the trial court could only look to the face of the pleading in deciding the motion. (3 Witkin, Cal. Procedure (2d ed. 1971) § 797, p. 2410.) ██ "A motion for judgment on the pleading has the same basic purpose and effect as a general demurrer. . . ." (*Fresno* v. *California Highway Com.* (1981) 118 Cal.App.3d 687, 692 [173 Cal.Rptr. 671]; *Buck* v. *Standard Oil Co.* (1958) 157 Cal.App.2d 230, 235 [321 P.2d 67].) A demurrer cannot be sustained unless the cause of action is necessarily barred by a statute of limitations. (*Childs* v. *State of California* (1983) 144 Cal.App.3d 155, 162 [192 Cal.Rptr. 526]; *Vassere* v. *Joerger* (1938) 10 Cal.2d 689, 693 [76 P.2d 656]; *Anderson* v. *McNelly* (1957) 150 Cal.App.2d 778, 783 [310 P.2d 975].) In the instant case, appellant merely pled the discovery of the erasure which constituted the alleged breach shortly before filing suit without giving specific time of the breach. Indeed since the defendants possessed exclusive knowledge as to

ations, does not amount to a clear and unequivocal repudiation of the joint venture. We construe them merely as bargaining tactics made in the context of contract negotiations.

The case of *Middletown* v. *Newport* (1936) 6 Cal.2d 57 [56 P.2d 508], cited by respondents, arose out of a joint venture agreement in which the plaintiff abandoned the bulk of his joint venture duties in 1913. From 1914 on the defendant treated the joint venture property as his own and exercised complete control over it. (*Id.,* at pp. 59-60.) In 1918, the defendant wrote a letter to plaintiff, expressly repudiating the joint venture. (*Id.,* at p. 61.) The court in that case concluded that plaintiff's action accrued in 1913 *when plaintiff terminated the joint venture by abandoning it.* (*Id.,* at p. 61.) The court went on to state, in dictum, that if the joint venture had not been terminated by abandonment, the defendant's exercise of complete control over the joint venture property would have repudiated the joint venture. (*Id.,* at p. 61.) Unlike the instant case, the acts of repudiation in *Middletown* were indeed unequivocal: the defendant had exercised sole control over the property for four years, including executing "contracts of sale in his sole name as owner and seller."

Respondents also quote a passage from *Maddox* v. *Rainoldi* (1958) 163 Cal.App.2d 384 [329 P.2d 599] which purportedly supports their argument of repudiation. (See *id.,* at p. 386.) The quoted passage is merely a recitation of one of the allegations in the complaint. *Maddox* is distinguishable from the instant case in that the plaintiff was alleging, rather than disputing repudiation and the primary issue involved application of the statute of frauds. (*Id.,* at pp. 386, 388, 391.)

If respondents intend to invoke the doctrine of anticipatory repudiation, that doctrine has no application here since it operates in some circumstances to permit a plaintiff a right of election when the defendant expressly repudiates the contract. The plaintiff may sue immediately upon such repudiation, or wait until performance is due under the contract and exercise his remedies for breach of contract at that later time. (*Mayo* v. *Pacific Project Consultants* (1969) 1 Cal.App.3d 1013, 1018 [82 Cal.Rptr. 117].) In short, the doctrine of anticipatory repudiation applies to a plaintiff's right to elect between bringing suit and has no application here. And, in any event, if the plaintiff elects to wait to sue when performance is due, the statute of limitations is tolled until the time when performance is due. (*Ross* v. *Tabor* (1921) 53 Cal.App. 605, 613 [200 P. 971].)

the date of the actual erasure, April was in no position to allege when that event occurred. Assuming the statute of limitations was deemed to begin running when the tapes were actually destroyed, the complaint is silent as to the date of destruction. This event may not have occurred until shortly before appellant found out about it and filed suit. As a result, confining consideration to the face of the pleadings, the cause of action for breach of the implied covenant is not necessarily time barred.

C. *Assuming the Erasure Occurred in 1972, the Discovery Rule Applies to the Breach of Fiduciary Duty Cause of Action.*

Since further proceedings may establish the precise date of appellant's injury, i.e., the date of tape erasure, we consider the appropriate rule for calculating when the statute of limitations itself commenced to run. Our inquiry focuses on whether the occurrence of the injury—the erasure of the tapes—is the critical event activating the statute or whether the "discovery rule" applies so that the statute began to run from the time appellant discovered or, through the exercise of diligence, should have discovered the erasure.

California courts have often stated the maxim that "[i]n ordinary tort and contract actions, the statute of limitations . . . begins to run upon the occurrence of the last element essential to the cause of action. The plaintiff's ignorance of the cause of action . . . does not toll the statute." (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187 [98 Cal.Rptr. 837, 491 P.2d 421].) This so-called "date-of-injury" accrual rule advances the fundamental policy underlying statutes of limitation: protecting "potential defendants by affording them an opportunity to gather evidence while facts are still fresh." (*Davies* v. *Krasna, supra,* 14 Cal.3d 502, 512.) It attempts to strike a balance between the plaintiff's interest in prosecuting an action and pursuing his rights, and the defendant's interest in fresh evidence with which to defend the action.

"The harshness of this rule has been ameliorated in some cases [however,] where it is manifestly unjust to deprive plaintiffs of a cause of action before they are aware that they have been injured." (*Leaf* v. *City of San Mateo* (1980) 104 Cal.App.3d 398, 406 [163 Cal.Rptr. 711].) Accordingly, "a cause of action under the discovery rule accrues when the plaintiff discovers or should have discovered all facts essential to his cause of action . . .; this has been interpreted under the discovery rule to be when 'plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence." (*Id.,* at p. 407, citations and italics omitted.) Thus, the discovery rule reflects concern for the practical needs of plaintiffs. It avoids dismissing

a suit on grounds of limitation when a plaintiff is blamelessly ignorant of his cause of action. (*Davies* v. *Krasna, supra*, 14 Cal.3d 502, 512.)

■ It is well-settled that the discovery rule applies to causes of action involving the breach of a fiduciary relationship. (E.g., *Cortelyou* v. *Imperial Land Co.* (1913) 166 Cal. 14, 20 [134 P. 981]—breach of trustee's duty; *Allsopp* v. *Joshua Hendy Machine Works* (1907) 5 Cal.App. 228, 234 [90 P. 39], overruled on other grounds, *Jefferson* v. *J. E. French Co.* (1960) 54 Cal.2d 717, 720 [7 Cal.Rptr. 899, 355 P.2d 643]—breach of agent's duty to his principal; *San Leandro Canning Co., Inc.* v. *Perillo* (1931) 211 Cal. 482, 486-487 [295 P. 1026]—breach of corporate director's duty; *Schneider* v. *Union Oil Co.* (1970) 6 Cal.App.3d 987, 993 [86 Cal.Rptr. 315]—breach of corporation's duty to stockholder; *National Automobile & Cas. Ins. Co.* v. *Pitchess* (1973) 35 Cal.App.3d 62, 64-65 [110 Cal.Rptr. 649]—sheriff's breach of duty to attaching creditor; *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra*, 6 Cal.3d 176, 190—breach of attorney's duty to client.) These cases articulate various rationales for holding that delayed accrual applies in such circumstances. In *Neel*, our high court noted that postponement of the period of limitations until discovery "prevents the fiduciary from obtaining immunity for an initial breach of duty by a subsequent breach of the obligation of disclosure." (*Id.*, at p. 189.) In an earlier opinion, the court rationalized applying the discovery rule to an action against corporate directors on the basis that "during the course of the transaction out of which [the] controversy arose . . . the defendants . . . were in the full control of [the corporation's] affairs and finances." (*San Leandro Canning Co., Inc.* v. *Perillo, supra*, 211 Cal. 482, 486-487. Thus, the date-of-discovery rule is applied to a fiduciary when strict adherence to the date of injury rule would result in unfairness to the plaintiff and would encourage wrongdoers to mislead their fiduciary to delay bringing suit. It is particularly appropriate when the defendant maintains custody and control of a plaintiff's property or interests.

■ These justifications are equally applicable to the instant case. Appellant and respondents were joint venturers, each occupying a fiduciary relation to the other. (*Fitzgerald* v. *Provines, supra*, 102 Cal.App.2d 529, 539.) Such a relationship compels a rule of delayed accrual to avoid barring a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence. Moreover, the wrongful act in the instant case consisted of destruction of the videotapes while they were in respondents' exclusive custody and control. Under these circumstances respondents cannot, in fairness, expect the statute of limitations to begin running the moment the clandestine act was completed. ■ ■ ■ ■ ■ By failing to inform appellant of the tape erasure, respondents ran the risk the statute of limitations would not activate

until sometime in the future when appellant discovered the injury.[11] Accordingly, the discovery rule applies to April's joint venture action.

D. *The Discovery Rule Is Applicable to the Breach of Contract Cause of Action.*

Although we do not think that the contract action for breach of the implied covenant of fair dealing requires a different result, application of the discovery rule to that cause of action requires additional discussion.

We note first that "[t]he nature of the right sued on, not the form of the action . . . determines the applicability of the statute of limitations." (*Schneider* v. *Union Oil Co.* (1970) 6 Cal.App.3d 987, 993 [86 Cal.Rptr. 315], citing *Jefferson* v. *J. E. French Co., supra,* 54 Cal.2d 717.) Here, both causes of action arise out of the fiduciary relationship. When a joint venturer commits a breach of fiduciary duty, the act may often, as here, constitute a breach of contract as well. Given the policy reasons for applying the discovery rule to a fiduciary, it would be pointless to permit the former cause of action and bar the latter. Thus the breach of contract cause of action also accrued at the discovery of the actual erasure.

Even disregarding the joint venture count, however, there are grounds to apply the discovery rule to this breach of contract claim.

True, California courts continue to hold that the general accrual rule is the date of injury. (See, *Neel, supra,* 6 Cal.3d 176, 187.) However, our research reveals the discovery rule has replaced the date-of-injury accrual rule in a growing number of actions in California. Indeed, one commentator has suggested the ever-expanding number of exceptions to what is stated as the general rule, threatens to "swallow" that rule entirely. The same commentator argues that the "rhetoric" in the case law should be changed to conform with the outcomes in this growing number of cases. (See O'Neal, *Accrual of Statutes of Limitations: California's Discovery Exceptions Swallow the Rule* (1980) 68 Cal. L.Rev. 106.)

We agree that as a result of judicial pronouncements, the discovery rule can be regarded as the general rule of accrual in many classes of cases in

---

[11]We also note that section 338, subdivision 4 of the Code of Civil Procedure, which expressly allows three years from the date of discovery in actions based on fraud or mistake, is also applicable in this case since the breach of a fiduciary duty often constitutes a constructive fraud. (*Boyd* v. *Bevilacqua* (1966) 247 Cal.App.2d 272, 290 [55 Cal.Rptr. 610].) "Indeed, during the existence of such fiduciary relationship [of joint venture] any transaction by which one of the co-adventurers secures an advantage over the other or others is presumptively fraudulent and casts a burden on such party gaining the advantage to show fairness and good faith in all respects." (*Ibid.,* citations omitted.)

California. It has been applied to nearly every conceivable action for professional malpractice, beginning with its application in 1936 to cases of medical malpractice. (*Huysman* v. *Kirsch* (1936) 6 Cal.2d 302, 312-313 [57 P.2d 908].)[12] Since the *Huysman* case was decided, the professional malpractice exception has been extended to escrowholders, (*Amen* v. *Merced County Title Co.* (1962) 58 Cal.2d 528, 534-535 [25 Cal.Rptr. 65, 375 P.2d 33]), accountants, (*Moonie* v. *Lynch* (1967) 256 Cal.App.2d 361, 365-366 [64 Cal.Rptr. 55]), stockbrokers, (*Twomey* v. *Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690, 725 [69 Cal.Rptr. 222]), title companies, (*Cook* v. *Redwood Empire Title Co.* (1969) 275 Cal.App.2d 452, 455 [79 Cal.Rptr. 888]), and insurance agents, (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 596-597 [83 Cal.Rptr. 418, 463 P.2d 770]). And, in 1971, in *Neel,* our high court held the discovery rule applied to attorney malpractice as well. In so holding, the court noted that although appellate courts applied the discovery rule to other malpractice actions, they "continued their doleful reiteration of the rule that actions for legal malpractice accrue at the time of the negligent act . . . ." (*Neel, supra,* 6 Cal.3d 176, at p. 186.)

Citing *Neel,* the Court of Appeal in *Seelenfreund* v. *Terminix of Northern Cal., Inc., supra,* 84 Cal.App.3d 133, at page 137, described the reasons supporting delayed accrual in malpractice actions: "The rule of accrual upon discovery in professional malpractice actions is supported by three considerations. *First,* a professional is bound by a special duty not merely to perform one's work with ordinary care but to use the skill, prudence and diligence commonly exercised by one's professional peers. Corollary to this first consideration is the inability of a lay client to recognize the negligence of a professional. *Second,* a client may not even have the opportunity to observe the negligent conduct of a professional. *Third,* all of the professionals who are subject to the rule of accrual upon discovery occupy a fiduciary relationship with respect to their clients." (Italics in original.)

The first two justifications given in *Seelenfreund*—inability to recognize and inability to observe the injury—provide the primary rationale for the growing number of judicial decisions which have held the discovery rule applicable to a variety of tort actions outside of the professional malpractice context. In those cases damage was not reasonably discoverable on the date of injury. They include such diverse actions as those for damages resulting from underground trespass, (*Oakes* v. *McCarthy Co.* (1968) 267 Cal.App.2d 231, 255 [73 Cal.Rptr. 127]), personal injury from negligently manufactured drugs, (*Warrington* v. *Charles Pfizer & Co.* (1969) 274

---

[12]California was the first state in the nation to apply the date of discovery rule to actions for medical malpractice.

Cal.App.2d 564, 569-570 [80 Cal.Rptr. 130]), personal injury based on products liability, (*G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 25 [122 Cal.Rptr. 218]), invasion of the right to privacy, (*Cain* v. *State Farm Mut. Auto. Ins. Co.* (1976) 62 Cal.App.3d 310, 315 [132 Cal.Rptr. 860]), damages for libel (*Manguso* v. *Oceanside Unified School Dist.* (1979) 88 Cal.App.3d 725, 731 [152 Cal.Rptr. 27]), damages resulting from latent defects in real property (*Allen* v. *Sundean* (1982) 137 Cal.App.3d 216, 222 [186 Cal.Rptr. 863]) and actions for breach of a fiduciary duty. (See discussion and citations, *supra.*) A review of these cases applying the discovery rule leaves the impression that, indeed, the discovery rule exception may have "swallowed" the general rule in tort cases.

Despite the growing number of tort actions to which the discovery rule applies, however (see *Cain* v. *State Farm Mut. Auto. Ins. Co., supra,* 62 Cal.App.3d 310, at p. 314, noting " 'a definite trend toward the discovery rule and away from the strict rule in respect of the time for the accrual of the . . . cause of action for personal injuries' "), our research reveals that the discovery rule has not yet been held applicable to breach of contract actions except in narrow cases involving fraud (e.g., *Watts* v. *Crocker-Citizens National Bank* (1982) 132 Cal.App.3d 516 [183 Cal.Rptr. 304]; Code Civ. Proc., § 338) or misrepresentation. (*Balfour, Guthrie & Co.* v. *Hansen* (1964) 227 Cal.App.2d 173 [38 Cal.Rptr. 525].) However, a review of the decisions of the highest courts in other jurisdictions uncovered one state, Maryland, which has held the discovery rule expressly applicable to breaches of contract not involving fraud. (*Poffenberger* v. *Risser* (1981) 290 Md. 631 [431 A.2d 677].)[13] Indeed, in *Poffenberger,* the Court of Appeals of Maryland redefined that state's accrual rule for *all* actions as the date the injury is reasonably discoverable.[14]

The recent *Seelenfreund* case, *supra,* 84 Cal.App.3d 133 also lends support for the proposition that California is not far from applying the discov-

---

[13]Maryland was also the first state to apply the discovery rule to legal malpractice actions. (*Mumford* v. *Staton, Whaley & Price* (1969) 254 Md. 697 [255 A.2d 359].)

[14]Quoting a previous decision in which it had held the discovery rule applicable to actions involving latent disease, the Maryland court noted both that "plaintiffs may, in appropriate circumstances, 'be blamelessly ignorant' of the fact that a tort has occurred and thus, ought not be charged with slumbering on rights they were unable to ascertain" and that "[a]voiding possible injustice in such cases outweighs the desire for repose and administrative expediency, which are the primary underpinnings of the limitations statute." (*Poffenberger, supra,* 431 A.2d 677, 680, quoting *Harig* v. *Johns-Manville Products* (1978) 284 Md. 70 [394 A.2d 299, 1 A.L.R.4th 105].)

That court went on to hold, "Having already broken the barrier confining the discovery principle to professional malpractice, and sensing no valid reason why that rule's sweep should not be applied to prevent an injustice in other types of cases, we now hold the discovery rule to be applicable generally in all actions and the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." (431 A.2d 677, 680.)

ery rule to some actions for breach of contract. In that case the parties entered into an oral contract for a termite inspection. A termite inspection rendered two years after the initial inspection revealed termite damage that had not been reported by the defendant. The court in *Seelenfreund* reversed the trial court's decision that the plaintiff's action was time barred, holding, instead, that the discovery rule applied. (84 Cal.App.3d 133, 136.)

The court in *Seelenfreund* justified its decision to apply the discovery rule by analogizing to the professional malpractice cases and noting a termite inspector was like a professional because of the detailed regulation of the pest control industry, including a statutory duty of disclosure akin to the fiduciary duty owed by the professional to his client, (*id.*, at pp. 137-138). The court also observed that the Business and Professions Code requires that a termite inspector possess highly specialized knowledge. This observation implies the court, in applying the discovery rule, also considered that a reasonable person, lacking specialized knowledge of pest control, would find it difficult to perceive damages. In other words, such knowledge is exclusively within the inspector's control since a person without the requisite knowledge would find it difficult to discover termite infestation. Posited this way, the reasoning is closely akin to the rationales previously noted which have been adopted by courts applying the discovery rule to many tort actions.

A common thread seems to run through all the types of actions where courts have applied the discovery rule. The injury or the act causing the injury, or both, have been difficult for the plaintiff to detect. In most instances, in fact, the defendant has been in a far superior position to comprehend the act and the injury. And in many, the defendant had reason to believe the plaintiff remained ignorant he had been wronged. Thus, there is an underlying notion that plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed. And often this is accompanied by the corollary notion that defendants should not be allowed to knowingly profit from their injuree's ignorance.

We also find this common thread present in the instant case even though it happens to be a breach of contract action. We note how different this case is from the typical contract breach where accrual logically begins at the time of injury.

In the typical contract for purchase of widgets, for example, the buyer is well aware the contract has been breached when the date for delivery arrives and he has not received his widgets. Similarly, the seller knows when payment is due under the contract. If that time passes without receipt of the amount due he is easily aware that the contract has been breached.

Here, however, respondents erased the tapes of the television show while those tapes were in their exclusive custody and control, in contravention of the covenant of good faith. To hold, as respondents suggest, that April's action accrued on the date of erasure, would amount to an expectation that a contracting party in such situations has a duty to continually monitor whether the other party is performing some act inconsistent with one of many possible terms in a contract. Imposing such a duty to monitor is especially onerous when the breaching party can commit the offending act secretly, within the privacy of its own offices.[15]

In this opinion, we do not adopt the broad Maryland view. Nor do we reject the general California rule that contract causes of action accrue at the date of injury. But we do find the unusual facts of this case call for an exception to the general rule. Specifically, we hold the discovery rule may be applied to breaches which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time.

■■■ Applying the discovery rule to certain, rather unusual breach of contract actions poses no more burden for the courts than the date-of-injury accrual rule in most instances. The discovery rule itself contains procedural safeguards protecting against lengthy litigation on the issue of accrual. It presumes that a plaintiff has knowledge of injury on the date of injury. In order to rebut the presumption, a plaintiff must plead facts sufficient to convince the trial judge that delayed discovery was justified. And when the case is tried on the merits the plaintiff bears the burden of proof on the discovery issue. (See *G. D. Searle & Co.* v. *Superior Court, supra,* 49 Cal.App.3d 22, 26.) Failure to meet this burden will result in dismissal of the suit.

The discovery rule protects those who are ignorant of their cause of action through no fault of their own. It permits delayed accrual until a plaintiff knew or should have known of the wrongful conduct at issue. (*Leaf* v. *City of San Mateo, supra,* 104 Cal.App.3d 398, 408.) ■■■ In the instant case

---

[15]The inherent difficulty, if not impossibility, of effectively monitoring for potential secretive breaches of contract is well illustrated by this case. Assume April asked Metromedia in late 1970 whether the tapes had been destroyed. Metromedia would have replied the tapes had already been erased, at least if the response was prepared by the same Metromedia personnel responsible for the allegation in the original answer in this case. That pleading, as will be recalled, recited the tapes were destroyed in 1970. But had April proceeded to sue for the erasures at that time, the Metromedia personnel responsible for the information in the amended answer that the tapes were not destroyed until 1972 might then have stepped forward to say, "No, we haven't destroyed the tapes as yet, after all." Plaintiffs should not be compelled to file "hair trigger" lawsuits over every possible secretive breach the defendant may have committed merely to smoke out whether the breach indeed has occurred and the statute of limitations thus commenced to run against them.

the ultimate question is whether appellant exercised reasonable diligence in discovering respondents' erasure of the tapes. "It is plaintiff's burden to establish 'facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry.' (*Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 437 [159 P.2d 958].) '[W]hether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide.' (*Enfield* v. *Hunt* (1979) 91 Cal.App.3d 417, 419 [154 Cal.Rptr. 146].)" (*Allen* v. *Sundean, supra,* 137 Cal.App.3d 216, 222.)

Thus, on the face of the pleadings and the opening statement, neither cause of action was barred by the statute of limitations. At trial the fact finder will determine whether appellant exercised due diligence in discovering the injury. If the allegations of lack of knowledge are sustained, appellant cannot be accused of failing to use reasonable and proper diligence to enforce the claim. On the other hand, if the evidence at trial shows knowledge or cause for knowledge appellant will not be protected and respondent will prevail.

CONCLUSION

This case cries out for a full development of the facts through a trial of the action. Applying the standards of review for judgment on the pleadings and nonsuit, we find the first amended complaint, the second amended complaint and the partial opening statement all state causes of action for breach of contract and breach of joint venture. The allegations of the answer and various motions and briefs filed by Metromedia may tend to undermine one or both of these causes of actions. But these allegations are not properly considered on a motion for judgment on the pleadings or a nonsuit. Similarly, applying those same standards of review, we find nothing in April's pleadings which raises a statute of limitations defense. Once again it is the allegations of Metromedia's answers, motions and briefs which suggest the possibility April's action may be barred. And once again it is not appropriate to take these allegations into consideration on a motion for judgment on the pleadings or nonsuit.

Accordingly, this judgment could have been reversed without reaching a number of the issues decided in this opinion. However, we desire to avoid a game of judicial ping pong between trial and appellate court, if at all possible. Thus, we felt it important to dispose of some particularly knotty legal problems which we anticipate may be raised by likely configurations of the facts as might emerge early in the proceedings after remand.

## Disposition

The judgment is reversed and remanded for further proceedings consistent with the views expressed in this opinion.

Schauer, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied November 2, 1983, and the opinion was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied December 22, 1983.