Filed 1/21/16  Worldwide Subsidy Group v. DW Studios CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| WORLDWIDE SUBSIDY GROUP, LLC, etc.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>DW STUDIOS, LLC, et al.,<br><br>        Defendants and Respondents. | B262200<br>(Los Angeles County<br>Super. Ct. No. BC511452) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Deirdre Hill, Judge.  Affirmed.

        Pick & Boydston and Brian D. Boydston for Plaintiff and Appellant.

        Caldwell Leslie & Proctor, Linda M. Burrow and Craig H. Bessenger for Defendants and Respondents.

In the underlying action, appellant Worldwide Subsidy Group (WSG) asserted claims against respondents DW Studios, LLC (DW Studios) and Paramount Pictures Corporation (Paramount) for breach of contract, breach of the implied covenant of good faith and fair dealing, and an accounting. The trial court granted summary judgment in favor of respondents on WSG's claims, concluding that they were time-barred. We find no error in that ruling, and affirm.

**RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

WSG is engaged in the business of collecting copyright royalties on behalf of copyright owners. In the late 1990's, DW Studios was a feature film producer and owner, often referred to as "DreamWorks." In or about 2006, Paramount acquired DW Studios' rights, obligations, and liabilities.

There are no disputes regarding the following facts: In May 1999, WSG and DW Studios entered into an agreement authorizing WSG to register claims for royalties owed to DW Studios and collect those royalties. The agreement defined the term "[d]istribution [p]roceeds" to encompass "any and all monies . . . distributed by audiovisual collection societies throughout the world . . . excluding . . . Canada, for all audiovisual copyright works owned and/or distributed by [DW Studios]." Under the agreement, WSG was entitled to a commission of 20 percent of the distribution proceeds it collected. Subject to a two-year minimum term, the agreement was to end "upon completion of the first full calendar semi-annual [i.e., six-month] period following written notice [of termination] by either party . . . ." WSG was entitled to a commission regarding "any [d]stribution [p]roceeds applicable" to the agreement's term, "irrespective of when such [d]istribution [p]roceeds [were] payable." Under that provision, WSG was entitled to commissions on distribution proceeds it received arising from exhibitions and transmissions of DW Studios's films during, or prior to, the agreement's term.

2

In a letter dated July 16, 2002, DW Studios notified WSG that the agreement was terminated effective December 31, 2002. The letter stated: "[E]ffective immediately, DreamWorks shall collect [d]istribution [p]roceeds . . . on its own behalf, and remit WSG's commission, as applicable, to WSG."

On June 11, 2013, WSG initiated the underlying action against respondents, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and an accounting. The complaint alleged that after the July 16, 2002 letter terminating the agreement, respondents breached the agreement and failed to provide an accounting of the royalties they had collected, "causing damages to WSG in an amount . . . not less than $100,000." Respondents sought summary judgment or adjudication regarding the complaint, arguing that WSG's claims were time-barred under the four-year statute of limitations applicable to actions for breach of a written contract (Code Civ. Proc., § 337, subd. 1).[1] The trial court granted summary judgment and entered judgment in favor of respondents and against WSG.[2]

## DISCUSSION

WSG contends the trial court erred in granting summary judgment on its complaint. For the reasons explained below, we disagree.

---

[1]     All further statutory citations are to the Code of Civil Procedure.

[2]     In addition to opposing respondents' motion for summary judgment or adjudication, WSG filed a motion for summary adjudication regarding its breach of contract claim, which the court denied. WSG does not challenge that ruling on appeal.

A. *Standard of Review*

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) To secure summary judgment, the defendant may demonstrate that "a complete defense exists" to the claims. (*County of San Diego v. Superior Court* (2015) 242 Cal.App.4th 460, 467; § 437c, subd. (c).)

"'Review of a summary judgment motion by an appellate court involves application of the same three-step process required of the trial court. [Citation.]'" (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662.) The three steps are: (1) identifying the issues framed by the complaint, (2) determining whether the moving party has made an adequate showing that negates the opponent's claim, and (3) determining whether the opposing party has raised a triable issue of fact. (*Ibid.*) Following a grant of summary judgment, we review the record de novo for the existence of triable issues. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)

Although we independently assess the grant of summary judgment, our inquiry is subject to two constraints. Under the summary judgment statute, we examine the evidence submitted in connection with the summary judgment motion, with the exception of evidence to which objections have been appropriately sustained. (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711; § 437c, subd. (c).) Furthermore, our review is governed by a fundamental principle of appellate procedure, namely, that "'[a] judgment or order of the lower court is presumed correct,'" and thus, "'error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, italics deleted, quoting 3 Witkin, Cal. Procedure (1954) Appeal, § 79, pp. 2238-2239; see also 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §355, p. 409.) Under this principle, WSG

4

bears the burden of establishing error on appeal, even though respondents had the burden of proving their right to summary judgment before the trial court. (*Frank and Freedus v. Allstate Ins. Co*. (1996) 45 Cal.App.4th 461, 474.) For this reason, our review is limited to contentions adequately raised in WSG's briefs. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.)[3]

 

B. *Section 337, Subdivision 1*

We begin by examining the principles governing the application of section 337, subdivision 1, which sets forth a four-year limitations period for "[a]n action upon any contract, obligation or liability founded upon an instrument in writing," absent exceptions not pertinent here. (§ 337, subd. (1).) WSG's claim for breach of a written contract is subject to that period, as is its claim for breach of the implied covenant and fair dealing. (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1144, fn. 4.) Furthermore, because the purpose of WSG's claim for an accounting was to recover money under the written contract, that claim also is subject to the four-year limitations period. (See *Jefferson v. J.E. French Co.* (1960) 54 Cal.2d 717, 718.)

"In ordinary tort and contract actions, the statute of limitation . . . begins to run upon the occurrence of the last element essential to the cause of action" (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187), that is,

---

[3] The two constraints narrow the scope of our inquiry. We observe that respondents asserted several evidentiary objections to WSG's showing, which the trial court sustained in part and overruled in part. In addition, the court struck a document filed by WSG entitled "Plaintiff's Separate Statement of Undisputed Material Facts in Support of Opposition to Motion for Summary Judgment." Because WSG does not challenge these rulings on appeal, it has forfeited any contention of error regarding them.

5

"when the cause of action is complete with all of its elements" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397). Thus, under section 337, subdivision 1, a claim upon a written contract "ordinarily accrues at the time of *breach*, and the statute begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his or her right to sue." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 520, p. 664, italics deleted.)

Nonetheless, claims based on a written contract are potentially subject to rules that toll accrual of the claim. As explained in *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 827-833 (*April Enterprises*), the so-called "discovery rule" tolls the accrual of contract-based claims involving the breach of a fiduciary relationship, as well as certain "unusual" breach of contract actions. There, a party filed a complaint against a television station for breach of contract, alleging that the station had erased recordings of a television program consigned to its care under a written contract. (*Id*. at pp. 813-815.) After the party's opening statement at trial, the trial court granted nonsuit on the grounds that the breach of contract claim was time-barred. (*Id*. at p. 815.) The appellate court applied the discovery rule to the breach of contract claim, concluding that the rule governs the accrual of claims when the injury or injury-causing act is difficult to detect, the defendant was "in a far superior position to comprehend" the act and injury, and the defendant has "reason to believe the plaintiff remained ignorant he had been wronged." (*Id*. at pp. 828-833.)

When applicable, "[t]he discovery rule protects those who are ignorant of their cause of action through no fault of their own. It permits delayed accrual until a plaintiff knew or should have known of the wrongful conduct at issue." (*April Enterprises*, *supra*, 147 Cal.App.3d at p. 832.) The rule thus tolls the accrual of a claim "until the aggrieved party has notice of the facts constituting the injury." (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1318

6

(*E-Fab*).)  In this context,  "[n]otice may be actual or constructive.  [Citation.] Actual notice is 'express information of a fact,' while constructive notice is that 'which is imputed by law.'  [Citation.]  A person with 'actual notice of circumstances sufficient to put a prudent man upon inquiry' is deemed to have constructive notice of all facts that a reasonable inquiry would disclose.  [Citations.]"  (*Id*. at pp. 1318-1319.)  To trigger the requisite constructive notice, "'[t]he circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.'"  (*Hobart v. Hobart Estate Co*. (1945) 26 Cal.2d 412, 438, italics deleted, quoting *Tarke v. Bingham* (1898) 123 Cal. 163, 166.) Although the existence of notice ordinarily presents a question for the trier of fact, that issue may be resolved on summary judgment when only one reasonable inference can be drawn from undisputed facts.  (*Cleveland v. Internet Specialties West, Inc.* (2009) 171 Cal.App.4th 24, 33.)

Also applicable to contract-based claims is the doctrine of fraudulent concealment, which is "[a] close cousin of the discovery rule" (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931 (*Bernson*)) that is "available 'in all cases'" (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 533, quoting *Kane v. Cook* (1857) 8 Cal. 449, 458).  "'It has long been established that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it.'"  (*Bernson*, *supra*, 7 Cal.4th at p. 931, quoting *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 99.)  The fraudulent concealment nullifies any negligence or fault on the plaintiff's part in failing to discover the facts relevant to the cause of action (*Baker v. Beech Aircraft Corp.* (1974) 39 Cal.App.3d 315, 321 (*Baker*)) and tolls the statute of limitations "as long as [the] plaintiff's reliance on the misrepresentations is reasonable"

7

(*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 637). Although the reasonableness of that reliance is ordinarily a question for the trier of fact, it may be decided as a matter of law when the facts permit only one conclusion. (*Grisham*, *supra*, 40 Cal.4th at p. 637.)

C. *Respondents' Showing*

In seeking summary judgment, respondents submitted evidence supporting the following version of the underlying events: Prior to July 16, 2002, WSG collected and remitted some distribution proceeds to DW Studios, even though royalties may remain unpaid for five years or longer after a claim for them is registered. On July 16, 2002, DW Studios notified WSG that their agreement was terminated effective December 31, 2002, and that DW Studios would henceforth collect its royalties and remit WSG's commission as appropriate. Two days later, Raul Galaz responded on behalf of WSG, stating that under the agreement, "a July 16[, 2002] notice of termination result[s] in termination effective June 30, 2003, not December 31, 2002." Galaz nonetheless acquiesced to DW Studios' demand that it alone would collect its royalties.

On October 17, 2003, DW Studios wrote to WSG, stating: "DreamWorks has received information that you have contacted certain collection societies purporting to represent DreamWorks with respect to amounts that are currently due and payable to DreamWorks by such collection societies. [¶] We hereby demand that you immediately cease and desist from any such contacts as the purported representative of DreamWorks. As you know, the . . . [a]greement between [WSG] and DreamWorks was terminated by letter . . . effective December 31, 2002 . . . ."

After the July 16, 2002 letter terminating the contract, WSG received no commissions from DW Studios, and made no inquiries regarding them prior to

8

2008. In May 2008, Screenrights -- a copyright collection society in Australia and New Zealand -- notified WSG and Paramount that they had registered competing claims for distribution proceeds relating to the movie Galaxy Quest (DreamWorks SKG 1999) (Galaxy Quest). The claims concerned royalties that had accrued to DW Studios in 2002. In an e-mail to WSG dated June 11, 2008, Jean McBride, a Paramount director responsible for copyright royalties, stated: "In the interest of getting the matter resolved . . . , Paramount . . . agrees to remit WSG a 20% fee after Paramount has collected from Screenrights the total royalty amount due to DreamWorks. [¶] Based on the foregoing, I must once again respectfully demand that you withdraw your claim as soon as possible . . . ."

In a June 13, 2008 e-mail, Galaz replied on behalf of WSG that Paramount's proposal was acceptable with respect to the claims submitted to Screenrights, which he noted also potentially encompassed royalties arising from the movie Saving Private Ryan (DreamWorks SKG 1998) (Saving Private Ryan). Galaz further stated: "The [July 16, 2002] letter . . . raises the issue as to whether DreamWorks (or its successor) has collected any royalties that should have been remitted to WSG, as the letter states that DreamWorks says that it will do [so]. WSG has received no accountings from Dreamworks (or Paramount), so am I correct to presume that no royalties have been collected for any DreamWorks titles? . . . [¶] Your prompt response is appreciated. "

On June 24, 2008, Screenrights notified WSG and Paramount that it would pay all the royalties arising from Galaxy Quest and Saving Private Ryan to Paramount. On the same date, at 6:21 a.m., Galaz sent an e-mail to Paramount and Screenrights acknowledging WSG's agreement permitting the disputed royalties to be paid over to Paramount, subject to WSG's right to a 20 percent commission on them. Galaz stated: "This is not a concession of WSG's claim to royalties attributable to DreamWorks programming . . . . [¶] . . . I would appreciate if you

could share with [WSG] the amount of royalties being paid over to Paramount for this programming."

Later, during the evening of June 24, 2008, Mary Basich, a Paramount executive vice president, replied by e-mail to Galaz's June 13 and June 24, 2008 e-mails. Basich stated that Paramount would pay WSG's 20 percent commission on royalties from Screenrights relating to Galaxy Quest "subject to receipt of a complete and up to date worldwide accounting *from WSG* of all amounts it has received (authorized or unauthorized) in connection with the exploitation of any DreamWorks motion pictures . . . ." (Italics added.) Basich also stated that Paramount would pay no commission to WSG on royalties from Screenrights relating to Saving Private Ryan because "[t]he international rights to [that movie] were not controlled by DreamWorks during the [t]erm of the [parties'] agreement . . . ."

WSG did not provide the accounting required by Paramount as a condition of payment, and although aware that Screenrights usually paid royalties in a timely manner, WSG took no action regarding its commission until June 12, 2009, nearly a year after Basich's June 24, 2008 e-mail. Galaz testified in his deposition that after resolving conflicting claims for royalties, Screenrights' "typical" response was to pay the royalties "[f]airly promptly," that is, "within six months, or something like that." However, WSG made no inquiry regarding its commission before June 12, 2009, when Galaz sent an e-mail to Paramount, stating: "[B]y e[-]mail of June 24, 2008, Mary Basich . . . confirmed that an accounting for such monies would be made *to WSG* for 'Galaxy Quest' . . . . [¶] Notwithstanding, no accounting for the 'Galaxy Quest' royalties collected by Paramount has occurred. . . . [¶] At this time, I would formally request an accounting from Paramount for the Screenrights royalties attributable to 'Galaxy Quest,' and any other royalties covered by the [parties'] agreement." (Italics added.)

10

On June 11, 2013, WSG initiated the underlying action.

D. *WSG's Showing*

WSG's opposition disputed little of respondents' showing.[4]  WSG acknowledged that pursuant to the contract, it had remitted $248,000 in royalty proceeds to DW Studios.  Regarding this matter, WSG submitted a declaration from Galaz, who stated that in January 2001, he gave DW Studies a $30,000 check representing its share of certain royalties, and that WSG later paid DW Studios additional royalties exceeding $218,000.  WSG also maintained that after the contract's termination, respondents collected royalties for the transmission of films during the term of the contract that they were obliged to share with WSG.  WSG pointed to a November 30, 2005 internal DW Studios e-mail that stated:  "We should be receiving our first payment . . . any day now (or it may have already come in . . . ) . . . covering cable retransmissions in Denmark. . . . [¶] . . .  It is possible we will need to pay WSG a 20% commission on the amounts that were paid for 2002 transmissions . . . ."  In addition, WSG submitted evidence that in 2006, DW Studios collected additional royalties subject to the contract.

In an effort to raise triable issues regarding the triggering of the limitations period, WSG relied primarily on evidence regarding communications between the parties after Galaz's June 12, 2009 e-mail to Paramount.  On October 30, 2009, in an e-mail to WSG's counsel, Basich stated:  "[D]espite our repeated requests,

_____

[4]    WSG disputed respondents' suggestion that it affirmatively rejected the termination date for the contract specified in DW Studios' July 16, 2002 letter.  In addition, WSG disputed whether the contract precluded it from sharing in certain royalties collected in Canada.  As neither issue is relevant to our determination regarding the propriety of trial court's grant of summary judgment, we do not discuss it further.

WSG has failed to provide DW [Studios] with any accounting and/or payments for the monies collected on DW's behalf. [¶]. . .  Nonetheless, in an attempt to amicably resolve this matter, DW [Studios] reiterates its willingness to acknowledge and remit any properly earned commissions . . . upon receipt of a full and complete worldwide accounting from WSG . . . ."  In November 2009 and October 2010 e-mails to Basich, WSG's counsel maintained that Paramount was obligated to provide an accounting of the royalties it had collected.

E. *Analysis*

In granting summary judgment, the trial court concluded that WSG's claims were time-barred.  We agree.[5]  Absent application of a tolling rule, WSG's claims accrued no later than 2006, as there is unchallenged evidence that in 2005 and 2006, respondents collected royalties potentially subject to the contract that they did not share with WSG.  For the reasons explained below, neither the discovery rule nor the doctrine of fraudulent concealment operated to toll the accrual of

---

[5]      WSG suggests that the summary judgment was improperly granted because the trial court previously overruled a demurrer to the complaint by respondents, which also asserted that WSG's claims were time-barred under section 337, subdivision 1.  We disagree.  A trial court is not precluded from granting a motion for summary judgment raising the same legal issues as a previously overruled demurrer, as they are "two different motions."  (*Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 205.)  In overruling respondents' demurrer, the court concluded that "the allegations [in the complaint] only show that the claims might be barred, not that they are in fact barred."  (Underscore omitted.)  That ruling cannot reasonably be regarded as precluding the court from determining there were no triable issues regarding the application of the limitation period following the presentation of evidence on a motion for summary judgment.

12

WSG's claims beyond the end of 2008. Accordingly, the claims accrued more than four years before WSG commenced the underlying action on June 11, 2013.[6]

In our view, the record discloses circumstances supporting the application of the discovery rule. As explained in *April Enterprises*, "the discovery rule may be applied to breaches which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." (*April Enterprises*, *supra*, 147 Cal.App.3d at p. 832.) Those circumstances are present here, as respondents' royalty collection activities were not directly observable by WSG, rendering it difficult for WSG to determine whether respondents' failure to pay commissions was attributable to ordinary delays in the receipt of those royalties.

The key question thus concerns when WSG had actual or constructive notice of its claims. (*E-Fab, supra*, 153 Cal.App.4th at pp. 1318-1319.) For purposes of the discovery rule, constructive notice is "triggered by suspicion." (*Id*. at p. 1319.) As our Supreme Court has explained, "[u]nder the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.[] . . . A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is

---

[6]    Although our conclusions rely in part on WSG's evidentiary showing, we may properly consider all the evidence submitted by the parties to determine the propriety of summary judgment. (*Villa v. McFerren* (1995) 35 Cal.App.4th 733, 750-751.)

13

clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Jolly v. Eli Lilly & Co.*(1988) 44 Cal.3d 1103, 1010-1111, fn. omitted.)

Here, the record conclusively shows that WSG knew, or should have known, of the misconduct alleged in the complaint as early as June 2008 and no later than December 2008. In June 2008, when Galaz and Basich exchanged e-mails regarding the disputed Screenrights royalties, WSG knew that respondents had paid no commissions to WSG after the July 16, 2002 letter of termination, even though WSG had collected substantial royalties pursuant to the contract prior to that letter. Galaz's June 13, 2008 e-mail to Paramount expressly raised the issue "whether DreamWorks (or its successor) ha[d] collected any royalties that should have been remitted to WSG . . ."and expressly inquired whether he was "correct to presume that no royalties ha[d] been collected for any DreamWorks titles[.]" However, Galaz received no direct response to that question. On June 24, 2008, when Screenrights informed the parties that it would pay the disputed royalties to Paramount and Galaz asked Paramount to share them with WSG, Basich told Galaz that WSG would receive no commission on the royalties until WSG provided a full accounting of its collection activities. WSG never provided the requested accounting, and otherwise took no action relating to the commissions for nearly a year, even though it knew that Screenrights would probably pay the royalties to Paramount within approximately six months, that is, by the end of 2008. These undisputed facts establish that under the discovery rule, WSG's claims accrued as early as June 2008 and no later than the end of 2008, that is, six months after the communications between Galaz and Basich.

WSG contends it acted reasonably in taking no action until June 12, 2009, when Galaz sent an e-mail to Paramount, asserting that Paramount had failed to provide the accounting of the Screenrights royalties Basich promised in her June 24, 2008 e-mail, and demanding a full accounting of all royalties collected. WSG

argues that the amount of the Screenrights royalties was insufficient to trigger a more vigorous response, and that the June 12, 2009 e-mail was "a reasonable follow-up investigation . . . ." WSG further argues: "Prior to June 12, 2009, there could have been any number of reasons why [DW Studios] had not yet accounted to WSG, including the possibility that Screenrights had been dilatory in making the payment to [DW Studios], the fact that [DW Studios] might have delayed payment to WSG due to an oversight, or some other internal [DW Studios] accounting issue . . . ."

WSG's contention fails in light of Basich's June 24, 2008 e-mail to Galaz, which notified WSG that absent an accounting from WSG, its commission would not be paid regardless of when Paramount received the Screenrights royalties. WSG thus could not reasonably attribute respondents' failure to pay the commission to some other cause, or complain -- as Galaz did in the June 12, 2009 e-mail -- that respondents had reneged on a purported June 24, 2008 promise by Basich to provide an accounting *to WSG*. Furthermore, by the end of 2008, WSG knew that respondents had paid no commissions, including the commission relating to the Screenrights royalties. These facts leave no doubt that as early as June 2008 and no later than the end of 2008, WSG had "'[a]ctual notice of circumstances sufficient to put a prudent man upon inquiry'" whether respondents had breached the contract, for purposes of the discovery rule. (*E-Fab, supra,* 153 Cal.App.4th 1308 at p. 1319.)[7]

---

[7] During oral argument, WSG's counsel maintained that respondents' refusal to pay the commission owed to WSG absent an accounting from WSG, as reflected in Basich's June 24, 2008 e-mail, constituted no potential breach of the contract, arguing that the contract obliged WSG to provide such an accounting. Because no such contention was raised in WSG's brief, it has been forfeited. Moreover, we would reject the contention were we to address it, as its key premise -- namely, that under the contract, respondents were entitled to withhold payment of WSG's

*(Fn. continued on next page.)*

In a related contention, WSG maintains that its inaction regarding the commissions owed to it after the July 16, 2002 termination letter is reasonably attributed to its awareness of the potentially lengthy "lag time" in collecting royalties. WSG asserts that "royalties for claims made in 'Year One' (if existent) are generally not collected until 'Year Four or Five' and in many cases 'Year Ten.'" However, in June 2008, WSG could not reasonably believe that *all* the royalties relating to its commissions were then uncollected. Galaz acknowledged in his deposition that not all royalties take ten years to collect. Indeed, WSG submitted a declaration from Galaz stating that in January 2001, he gave DW Studios a $30,000 check representing its share of certain royalties, and that WSG later paid DW Studios additional royalties exceeding $218,000. Thus, in June 2008, WSG knew that it had collected significant royalties in a relatively brief period before the contract was terminated, and that the Screenrights royalties were, in fact, to be paid shortly to Paramount. That knowledge precluded any reasonable belief by WSG that no royalties had been collected.[8]

commissions in the absence of an accounting from WSG -- is inconsistent with WSG's claims. "It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance." (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380.) WSG's claims for unpaid commissions thus fail if respondents properly predicated payment of WSG's commissions on WSG's provision of an accounting, as it is undisputed that WSG has never provided the accounting demanded by respondents.

[8] During oral argument, WSG's counsel maintained that in June 2008, WSG reasonably believed that no significant royalties were collected after the contract's termination, pointing to evidence that the United States Copyright Office has only recently awarded certain royalties attributable to the period from 2000 to 2003. However, WSG has identified no evidence that it reasonably viewed those royalties as constituting the only significant ones to be collected after the contract's termination. On the contrary, WSG submitted evidence that in January 2001, Galaz presented DW Studios with a $30,000 check representing royalties collected

*(Fn. continued on next page.)*

16

WSG also contends that under the doctrine of fraudulent concealment, the accrual of its claims was tolled until November 2009 or October 2010, when its counsel demanded an accounting from respondents. WSG argues: "[D]iscovery . . . revealed that [DW Studios] did collect royalty proceeds for which WSG was entitled a share as long ago as 2005 and 2006, and kept it a secret from WSG, despite inquiries by WSG as to such collections." As explained below, we reject the contention.

To establish fraudulent concealment, WSG must show that "it was not at fault for failing to discover [its claims] or had no actual or presumptive knowledge of facts sufficient to put [it] on inquiry." (*Baker*, *supra*, 39 Cal.App.3d at p. 321.) Thus, "[m]ere ignorance, *not induced by fraud* of the existence of facts constituting a cause of action does not prevent the running of the statute of limitations." (*Ibid*.) Fraudulent concealment may take the form of active misrepresentations or silence and nondisclosure. (*Scafidi v. Western Loan & Bldg. Co.* (1946) 72 Cal.App.2d 550, 562-563.) Silence does not constitute concealment absent a fiduciary or confidential relationship between the parties, or "some specially appearing circumstances . . . which of themselves equitably estop a person from relying on his silence or inaction, and which of themselves are sufficient to create on the part of the nonrevealor a positive duty to speak or act . . . ." (*Id*. at p. 562.)

Here, there is no evidence that WSG's tardy assertion of its claims was induced by fraudulent concealment. "'The doctrine of fraudulent concealment [for tolling the statute of limitations] does not come into play . . . if a plaintiff is on notice of a potential claim.'" (*Rita M. v. Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1460, quoting *Hobson v. Wilson* (D.C. Cir. 1984) 737 F.2d 1,

from "[w]orldwide" sources. In addition, respondents' showing included evidence that prior to March 2002, WSG collected royalties from Spain and the Netherlands.

35.) As explained above, WSG had notice of its claims as early as June 2008, and no later than the end of 2008, for purposes of the discovery rule. Nothing before us suggests that some act of fraudulent concealment induced WSG not to act on that notice. There is no evidence of an active misrepresentation. Nor was there any potential fraudulent concealment by silence sufficient to toll the accrual of WSG's claims, as WSG has identified no fiduciary or confidential relationship between the parties, and no circumstances capable of imposing a positive duty on respondents to speak or act arose before June 2008, when Galaz inquired whether he was "correct to presume that no royalties ha[d] been collected for any DreamWorks titles." Because respondents' conduct following that inquiry -- namely, their failure to answer Galaz's question, and refusal to pay WSG's commission in the absence of an accounting -- operated to give WSG notice of its claims, no fraudulent concealment by silence occurred.

WSG suggests that respondents' failure to disclose its breaches of the contract in 2005 and 2006, by itself, constituted fraudulent concealment. We disagree. In *Mark K. v. Roman Catholic Archbishop* (1998) 67 Cal.App.4th 603, 606-609, the plaintiff asserted claims predicated on allegations that he was sexually abused by a priest in 1975 and 1976. The trial court sustained a demurrer to the complaint without leave to amend, concluding that the claims were time-barred. (*Id*. at p. 609.) Affirming that ruling, the appellate court rejected the plaintiff's contention that the defendant's mere failure to disclose evidence of the sexual abuse constituted fraudulent concealment, stating: "If plaintiff's approach were to prevail, then any time a tortfeasor failed to disclose evidence that would demonstrate its liability in tort, the statute of limitations would be tolled under the doctrine of concealment. . . . [T]his is not the law." (*Mark K., supra,* 67 Cal.App.4th at p. 613.) That rationale applies here as well. In sum, summary judgment was properly granted.

18

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.